**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

WELLS FARGO SECURITIES, LLC

                 Plaintiff,

   -against-

LJM INVESTMENT FUND, L.P. and LJM
PARTNERS, LTD.,

                Defendants.

LJM INVESTMENT FUND, L.P., LJM
MASTER TRADING FUND, L.P., LJM
OFFSHORE FUND, LTD., AND PFC-LJM
PRESERVATION AND GROWTH FUND, L.P.,

          Counterclaimants,

   -against-

WELLS FARGO SECURITIES, LLC,

          Counter-defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Civil Action No. 18-cv-2020 (KBF)

**ANSWER AND COUNTERCLAIMS**

       Defendants LJM Investment Fund, L.P. ("LJM Fund") and LJM Partners, Ltd. ("LJM Partners"), by and through their undersigned attorneys, submit their answer, affirmative defenses and counterclaims to the complaint ("Complaint") of Plaintiff Wells Fargo Securities, LLC ("Wells"), and Counterclaimants LJM Master Trading Fund, L.P., LJM Offshore Fund, Ltd., and PFC-LJM Preservation and Growth Fund, L.P., (together with LJM Fund, "Counterclaimants") assert their counterclaims against Wells, and aver as follows:

1.      Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 1.

2.      Defendants admit the allegations of Paragraph 2.

3.      Defendants admit the allegations of Paragraph 3.

4.      Defendants deny that Anthony J. Caine is the sole income beneficiary of the trusts and otherwise admit the allegations of Paragraph 4.

5.      Paragraph 5 of the Complaint states a legal conclusion for which no response is required.

6.      Paragraph 6 of the Complaint states a legal conclusion for which no response is required.

7.      Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 7.

8.      Paragraph 8 of the Complaint states legal conclusions for which no response is required.

9.      Defendants admit that LJM Fund traded derivatives on the CME and that, for certain periods of time, Wells acted as its clearing FCM. LJM Fund admits it was a party to a contract with Wells and respectfully refers the Court to that document for the complete and accurate statement of its contents. Defendants deny that they were required to pay Wells for margin payments or losses paid by Wells to the CME in all circumstances. Defendants otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 9 of the Complaint.

10.     Defendants admit that on or about February 5, 2018, LJM Fund sustained unrealized paper losses on certain of its CME derivative contracts. Thereafter, as set forth below,

Wells unlawfully caused Defendants to liquidate positions in a manner such that the portfolio's unrealized losses became real incurred losses. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegation that Wells was required to pay over $16 million to the CME. Defendants otherwise deny the allegations of Paragraph 10.

11.     Defendants admit that on or about February 26, 2015, Wells and LJM Fund entered into the "Agreement," as that term is defined in Paragraph 11 of the Complaint. The rest of the allegations of Paragraph 11 consist of partial and incomplete quotations of language from the Agreement, and Defendants accordingly respectfully refer the Court to that document for the complete and accurate statement of its contents.

12.      The allegations of Paragraph 12 consist of partial and incomplete quotations of language from the Agreement, and Defendants accordingly respectfully refer the Court to that document for the complete and accurate statement of its contents.

13.     The allegations of Paragraph 13 consist of partial and incomplete quotations of language from the Agreement, and Defendants accordingly respectfully refer the Court to that document for the complete and accurate statement of its contents.

14.     The allegations of Paragraph 14 consist of partial and incomplete quotations of language from the Agreement, and Defendants accordingly respectfully refer the Court to that document for the complete and accurate statement of its contents.

15.     The allegations of Paragraph 15 consist of partial and incomplete quotations of language from the Agreement, and Defendants accordingly respectfully refer the Court to that document for the complete and accurate statement of its contents.

16.     Defendants admit that on or about February 5, 2018, LJM Fund sustained unrealized paper losses on certain of its CME derivative contracts, and otherwise deny the allegations of Paragraph 16.

17.     Defendants deny the allegations of Paragraph 17. Among other things, Wells fails to disclose to the Court that, by letter dated February 5, 2018, Wells terminated the parties' Agreement.

18.     Defendants admit that on February 8, 2018, Wells sent to LJM Fund the documents attached as Exhibits 3 and 4 to the Complaint and refer the Court to those documents for their complete and accurate contents. Defendants otherwise deny the allegations of Paragraph 18.

19.     Defendants deny the allegations of Paragraph 19.

20.     Defendants admit that on or about February 26, 2018, Wells sent to LJM Fund the document attached as Exhibits 5 to the Complaint, and respectfully refer the Court to that document for the complete and accurate statement of its contents. Defendants otherwise deny the allegations of Paragraph 20.

21.     Defendants deny that LJM Fund failed to post contractually required margin and deny that it was required to make payments to Wells. On that basis, Defendant deny the allegations of Paragraph 21.

22.     Defendants deny that LJM Fund failed to honor its contractual obligations and denies that Wells incurred "damages." Defendants otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 22.

23.     Defendants deny the allegations of Paragraph 23.

24.     Defendants deny the allegations of Paragraph 24.

25.     Defendants incorporate their responses in Paragraphs 1-24 as part of their response to Count 1.

26.     Defendants state that Paragraph 26 states a legal conclusion for which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 26.

27.     Defendants deny the allegations of Paragraph 27.

28.     Defendants deny the allegations of Paragraph 28.

29.     Defendants deny the allegations of Paragraph 29.

30.     Defendants admit that LJM Partners is the general partner of LJM Fund and otherwise deny the allegations of Paragraph 30.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a cause of action for which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff cannot recover due to its own prior breach of the Agreement, and its own prior breach of the implied covenant of good faith and fair dealing.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's injuries were caused, in whole or in part, part by its own conduct.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's injuries were caused, in whole or in part, by intervening causes unrelated to Defendants' conduct.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff is estopped from seeking the relief sought in the Complaint due to its own conduct upon which Defendants relied.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred by the doctrine of unclean hands.

### SEVENTH AFFIMATIVE DEFENSE

Defendants' performance is excused due to improper interference by Plaintiff.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's recovery is barred because it deliberately assumed the risk of loss by virtue of its decision to unbalance LJM Fund's portfolio hedges.

### NINTH AFFIRMATIVE DEFENSE

Plaintiff's recovery is barred due to failure to satisfy conditions precedent.

### TENTH AFFIMATIVE DEFENSE

The recovery sought by Plaintiff is barred, in whole or in party, due to its failure to mitigate damages.

### ELEVENTH AFFIRMATIVE DEFENSE

Defendants reserve the right to add or amend affirmative defenses during the discovery process.

### COUNTERCLAIMS

Defendant-Counterclaimant LJM Fund and Counterclaimants LJM Master Trading Fund, L.P., LJM Offshore Fund, Ltd., and PFC-LJM Preservation and Growth Fund, L.P. (collectively, "Counterclaimants" or "LJM"), as for their counterclaims against Counter-defendant Wells, aver as follows:

1.      This case arises from devastating losses needlessly suffered by Counterclaimants and their affiliates as a result of improper interference by Wells, LJM's futures commission merchant ("FCM"). During an event on February 5, 2018 known as "Vol-mageddon"—an

extraordinary and anomalous "Black Swan" event in the futures and options market, suspected of being the result of market manipulation—LJM sustained significant, primarily unrealized, losses.

2.     Rather than allowing LJM time to execute its well-conceived plan to contain its temporary paper losses until the market normalized—which it did only a day later, by late morning of February 6, 2018—Wells precipitously terminated the parties' futures commission merchant agreement and ordered an immediate liquidation of LJM's entire portfolio. Wells was the only one of LJM's four futures commission merchants to react in this manner. Wells recklessly took these self-interested actions even though it concededly did not have a current statement of LJM's portfolio, which would have reflected substantial risk-reducing measures that LJM already had undertaken on February 5th.

3.     The following morning, abusing its practical control over the LJM portfolio, Wells imposed upon LJM a series of catastrophic trades that locked in the portfolio's primarily unrealized losses and made them real. Worse, Wells' self-serving trading "strategy" vastly expanded the scope of LJM's losses. To ensure that LJM "played ball" on this suicide mission, Wells sent two minders to LJM's offices before the markets opened, to peer over the shoulders of LJM traders and report back to headquarters their compliance with Wells' instructions.

4.     As a result of Wells' reckless actions—in breach of the Agreement as well as of its duties to LJM—LJM and its affiliated funds sustained losses of no less than $100 million. Adding insult to injury, after laying waste to LJM's portfolio, Wells purported to make a margin demand of $16.4 million, asserting the right to collect millions of dollars under the terms of an agreement it self-servingly terminated.

## Parties

5.      Defendant-Counterclaimant LJM Fund is a Delaware limited partnership. None of the partners of the LJM Fund are citizens of the states of North Carolina or Delaware.

6.      Counterclaimant LJM Master Trading Fund, L.P. is a Delaware limited partnership. None of the partners are citizens of the states of North Carolina or Delaware.

7.      Counterclaimant LJM Offshore Fund, Ltd. is a Cayman Islands corporation (exempted company) with its principal place of business on Grand Cayman in the Cayman Islands.

8.      Counterclaimant PFC-LJM Preservation and Growth Fund, L.P. is a Delaware limited partnership.  None of the partners are citizens of the states of North Carolina or Delaware.

9.      Counter-defendant Wells is a Delaware limited liability company. Its sole member is EVEREN Capital Corporation, a Delaware corporation with its principal place of business in North Carolina.

## Jurisdiction and Venue

10.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) because it is between citizens of different States, and the amount in controversy exceeds $75,000.

11.      Counter-defendant Wells submitted itself to the jurisdiction of this Court by filing the Complaint.

## Factual Allegations

12.      Counterclaimants each entered into future commission merchant agreements with Wells under which Wells provided certain clearing and execution services (the "Agreements").

13.      The Agreements were terminable upon written notice by either party. In the event of termination, Counterclaimants each had the option of closing out open trades or transferring all open positions to another FCM.

14.     As of 2018, LJM held options positions in reference to futures contracts on the Standard and Poor's 500 index (the "S&P 500"). LJM purchased and sold both calls (options to buy at a specified price) and puts (options to sell at a specified price). LJM managed the short option positions such that at any given time, they were "out the money" – that is, if the current market price of the underlying S&P 500 future remained the same as of the option expiry date, the option would expire without being exercised, or without payment being required by either side of the contract.

15.     On February 5, 2018, the options markets experienced extreme and unusual instability, culminating in a sudden unexplained spike in the "VIX," an index reflecting market volatility. Commentators referred to this extraordinary market event as "Volatility Black Monday" or "Vol-mageddon."

16.     The extreme market event resulted in mark-to-market losses on LJM's open options positions. However, these losses primarily were unrealized paper losses. In response, LJM traded actively to rebalance the portfolio and offset risk.

17.     In the afternoon, the spike in volatility overwhelmed the exchange. LJM was able to execute risk reducing trades throughout the afternoon. However, due to excessive volume and system failures at the CME and its affiliated brokers, those trades were not fully processed by the executing brokers and reflected in statements of LJM's accounts with Wells.

18.     On or about the close of trading on the afternoon of February 5, LJM informed Wells of the numerous risk reducing trades made to protect its portfolios that had not yet been processed. Wells knew, and acknowledged, that its own record of the accounts was incomplete and did not reflect the significant reduction of risk exposure accomplished that day.

19.    LJM suffered significant unrealized losses on February 5. However, it was understood that the VIX spike was an anomalous event—upon information and belief, caused by market manipulation. If the markets stabilized and recovered (as they did), LJM was well-positioned to recover much of the paper losses it had suffered. If the markets continued to deteriorate, LJM was in the best position to contain the scope of the losses.

20.    LJM had a standard process to contain and adjust its portfolios (for full adherence to required margins and risk constraints) to contain the paper losses until the market normalized. LJM had executed this process effectively on numerous occasions in the past. However, all those well laid plans went awry due to unlawful interference by Wells.

21.    During the evening of February 5, Wells sent out a position statement and margin request for an LJM-affiliated mutual fund. This statement and accompanying margin request was supposed to reflect the true state of the Fund's portfolio. However, Wells sent out the statement without incorporating the afternoon's risk-reducing trades. Wells knew that its statement was based upon incomplete and incorrect information, but nonetheless demanded exorbitantly high margin deposits in reliance upon this admittedly incorrect information.

22.    At around 6 a.m., on February 6, 2018, well before market open, Wells contacted LJM by phone and gave notice of its intent to wholly terminate the parties' business relationship. Wells further ordered that LJM liquidate its portfolios immediately. This call was followed by a formal letter, sent at 7:36 a.m., expressly terminating the Agreements as of right under Section 24 of the Agreements. Wells took these precipitous actions although it knew they were based upon false and incomplete information concerning the content of LJM's portfolio, and although Wells knew the true risk level in the portfolio already had been substantially reduced. None of LJM's

three other FCMs—I.F. Stone, Bank of America/Merrill Lynch or RBC—terminated their futures commission merchant agreements with LJM or ordered the liquidation of any positions.

23.     Wells did not merely direct that LJM liquidate its open positions, but also prescribed the specific means of doing so. In particular, Wells instructed LJM to conduct an immediate bulk sale of E-mini S&P 500 futures (the "E-mini futures").

24.     LJM never would have sold E-mini futures on its own accord. An LJM affiliate had engaged in one such trade in 2011, with extremely poor results. The P&G Fund (the largest LJM fund held at Wells) had never traded E-mini futures in its entire eight-year history. The effect of trading E-mini futures before market open on February 6 reasonably would be expected to have a catastrophic effect. In the hours before market open, the relatively illiquid after-hours market had extreme and unusual spreads between futures and cash markets. Selling futures, without waiting for the market to open and adjust, would immediately realize and lock in massive unrealized paper losses from the prior day. At the same time, selling E-mini futures would recklessly unbalance the portfolio—exposing LJM to further brutal losses should the market correct and stabilize (which it did only hours later that same day).

25.     Despite grave misgivings about the sale of E-mini futures, Counterclaimants were forced to comply. Wells' message was loud and clear: either LJM carried out the E-mini futures trades, or Wells would simply seize control of the portfolio and conduct the liquidating trades itself. In addition, Wells sent two minders to LJM's offices to oversee and report on LJM's compliance with Wells' instructions. The Wells employees arrived before market open and stayed through the end of the day, constantly monitoring and reporting on LJM's activities.

26.     LJM's fears concerning Wells' misguided prescription quickly were realized. The sale of E-mini futures resulted in massive losses to the portfolio, even before the options markets

opened. In addition, the sale left the overall portfolio dangerously unbalanced. In the ordinary course of business, LJM carefully hedged its book: it sold both put options (betting against a market fall) and call options (betting against a market rise). The rapid sale of E-mini futures had the effect of closing out the open put option positions, while leaving the call option positions open and intact. This left LJM wholly exposed in the event that the markets stabilized or recovered, a typical development the day after an anomalous market move.

27.     Sure enough, the market did stabilize and recover by mid-morning that same day. By 11:00 a.m., Wells cleared LJM to cease trading E-mini futures. However, by then it was too late—the put side of LJM's book had been unwound, and the best that LJM could do was to attempt to limit the damage on the now completely unhedged portfolio.

28.     If LJM had not liquidated, but simply maintained the positions it had on the morning of February 6, LJM's accounts would have been up by 10%.  If LJM had carried out its well-practiced risk containment procedures, it would have experienced some losses, but far less than those actually incurred.

29.     Instead, by the end of the trading day (3:15 p.m.), per Wells' instructions, LJM had completely unwound its portfolio with disastrous results, losing more than $266 million across all managed and affiliated funds—at least $115 million more than if LJM had been allowed to apply its trading procedures. Of these trading losses, approximately $90 million alone resulted from the E-mini futures trades directed by Wells.

30.     As a result of Wells' forced liquidation of LJM's accounts, LJM also was forced to liquidate its identically composed accounts held with I.F. Stone, Bank of America Merrill Lynch and RBC, using the same trades. As a result, each of these accounts incurred identically catastrophic losses.

31.     That same day, two minutes after the close of trading, Wells sent LJM a letter perversely purporting to "rescind" its termination notice from earlier that morning, upon which Wells premised the involuntary liquidation, and to "reinstate" the Agreements—even though there remained no open positions in any of LJMs accounts.

32.     Evidently, during the day, as Wells forced the liquidation of LJM's accounts, Wells and its lawyers came to realize that Wells' termination under Section 24 of the Agreements had important consequences—including eliminating many of the remedies Wells previously had while the agreement was executory, such as the right to demand margin. The termination also eliminated the parties' prior disclaimer of Wells' fiduciary duties and any contractual limitation on Wells' liability.

33.     Having irrevocably terminated the Agreements—and caused LJM to change its position to its extreme detriment—Wells now purported to unilaterally "reinstate" its former contractual rights. Undoubtedly, Wells hoped that doing so would help it avoid responsibility for the massive losses LJM incurred that day. Thus, Wells hoped to have its cake and eat it too. But Wells cannot.

34.     In its Complaint, Wells seeks to distract from its role in causing LJM's losses and focuses instead on an invalid demand for margin it made upon LJM several days after the termination and liquidation. Although Wells lost its right to demand margin after terminating the Agreements, on February 8, 2018, Wells purported to make a margin call upon LJM in the amount of $16,367,911.62.

35.     By attempting to frame this case as a simple breach of LJM's former contractual obligation to provide margin, Wells seeks to elide its own grievous responsibilities. In reality, however, this case is not about the failure of LJM to meet a $16 million margin call. It is about

Wells' role in causing losses of more than $100 million to LJM funds, losses directly resulting from trades it devised and foisted upon LJM.

## COUNT I
### (Breach of Contract)

36.     Counterclaimants repeat and reallege the allegations above as if fully set forth herein.

37.     Wells and the Counterclaimants executed the Agreements, which were all valid contracts.

38.     Counterclaimants fully performed their obligations under the Agreements.

39.     On February 6, 2018, Wells invoked the termination clause in Section 24 of the Agreements.

40.     Under the termination clause, Counterclaimants were entitled either to "close out open positions in the Account" or to "arrange for such open positions to be transferred to another FCM."

41.     Instead of permitting Counterclaimants to manage their own book, in breach of the Agreements, Wells recklessly coerced them into liquidating their portfolios in a commercially unreasonable manner.

42.     In the absence of Wells' breach, Counterclaimants would not have traded the portfolio as directed by Wells.

43.     The Wells liquidation and trades resulted in losses far greater than would have occurred had Counterclaimants been permitted to manage their portfolio as set forth in the Agreements.

44.     By reason of the foregoing, Counterclaimants are entitled to damages resulting from the breach.

## COUNT II
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

45.     Counterclaimants repeat and reallege the allegations above as if fully set forth herein.

46.     Wells and the Counterclaimants executed the Agreements, which were all valid contracts.

47.     Counterclaimants fully performed their obligations under the Agreements.

48.     On February 6, 2018, Wells invoked the termination clause in Section 24 of the Agreements.

49.     Under the termination clause, Counterclaimants were entitled either to "close out open positions in the Account" or to "arrange for such open positions to be transferred to another FCM."

50.     An implied term of the Agreements was that, in the event of termination, Counterclaimants were entitled to close out their books free from any coercion, duress, or undue influence by Wells that effectively would negate that bargained for contractual right.

51.     Instead of permitting Counterclaimants to manage their own books, in breach of the Agreements, Wells recklessly forced them to liquidate their portfolios in a commercially unreasonable manner.

52.     In the absence of Wells' breach, Counterclaimants would not have traded the portfolio as directed by Wells.

53.     The Wells liquidation and trades resulted in losses far greater than would have occurred had Counterclaimants been permitted to manage their portfolio as set forth in the Agreements.

54.     By reason of the foregoing, Counterclaimants are entitled to damages resulting from the breach.

**COUNT III**
**(Breach of Fiduciary Duty)**

55.     Counterclaimants repeat and reallege the allegations above as if fully set forth herein.

56.     As a future commissions merchant, Wells owed fiduciary duties of care and loyalty under New York law to LJM, as its principal.

57.     Although in the Agreements, LJM contractually disclaimed Wells' fiduciary duties as its agent, Wells terminated the Agreements on February 6, 2018, before forcing the liquidation of LJM's accounts. By their terms, the Agreements expressly do not preserve the contractual disclaimer of fiduciary duties after termination.

58.     Wells forced LJM to liquidate its accounts in a means and manner reasonably expected to result in catastrophic losses to LJM, and which in fact did result in catastrophic losses to LJM.

59.     Wells ordered the liquidation, which destroyed all value in LJM's accounts, solely for the purpose of protecting Wells—and at the expense of LJM. Thus, in breach of its duty of utmost loyalty to LJM, Wells put its own interests ahead of the interests of its principal.

60.     Wells further ordered that the liquidation be conducted in a means and manner inconsistent with its fiduciary duty of care, for example directing that LJM sell E-mini futures before market open which locked in massive losses and unhedged the portfolio, exposing LJM to even greater risk.

61.     By reason of the foregoing, Counterclaimants are entitled to damages resulting from Wells' breaches, including punitive damages.

## COUNT IV
### (Negligence)

62.     Counterclaimants repeat and reallege the allegations above as if fully set forth herein.

63.     As a future commissions merchant, Wells owed a duty of care to LJM.

64.     Wells forced LJM to liquidate its accounts in a means and manner reasonably expected to result in catastrophic losses to LJM, and which in fact did result in catastrophic losses to LJM.

65.     Wells ordered that the liquidation be conducted in a means and manner inconsistent with its duty of care to LJM, for example directing that LJM sell E-mini futures before market open which locked in massive losses and unhedged the portfolio, exposing LJM to even greater risk.

66.     By reason of the foregoing, Counterclaimants are entitled to damages resulting from Wells' negligence, including punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Defendants and Counterclaimants pray that the Court:

a)     Dismiss the Complaint in its entirety;

b)     Award Counterclaimants compensatory damages in an amount to be proved at trial.

c)     Award Counterclaimants appropriate punitive damages;

d)     Award of Counterclaimants' interest and costs and disbursements, including attorney's fees; and

e)     Grant such other relief as it deems necessary and proper.

Dated: New York, New York
       May 2, 2018

PRESS KORAL LLP

By:     /s/ Jason M. Koral
        Jason M. Koral
        Matthew J. Press

641 Lexington Avenue, Thirteenth Floor
New York, NY 10022
Phone: (212) 520-8270
jkoral@presskoral.com