## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

WELLS FARGO SECURITIES, LLC

       Plaintiff,

  v.

LJM INVESTMENT FUND, L.P., and LJM
PARTNERS, LTD.,

       Defendant.

LJM INVESTMENT FUND, L.P., LJM
MASTER TRADING FUND, L.P., LJM
OFFSHORE FUND, LTD., and PFC-LJM
PRESERVATION AND GROWTH FUND, L.P.,

       Counterclaimants,

  v.

WELLS FARGO SECURITIES, LLC

       Counter-defendant.

Case No. 1:18-cv-2020(KBF)
Hon. Katherine B. Forrest

## WELLS FARGO SECURITIES, LLC'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION TO DISMISS LJM'S COUNTERCLAIM

Howard J. Roin*
Thomas S. Kiriakos*
Peter B. Baumhart*
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL  60606
*admitted *pro hac vice*

Nina N. Shah
MAYER BROWN LLP
1221 6th Avenue
New York, NY  10020

Filed: June 15, 2018

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................ 1

I.     THE COMPLAINT AND COUNTERCLAIMS ................................ 2

II.    BACKGROUND ..................................................................... 4

    A.    The Federal Regulatory Scheme................................................ 4

    B.    The LJM/WFS Clearing Agreement ....................................... 8

III.    LEGAL STANDARD ............................................................ 11

IV.    ARGUMENT ....................................................................... 12

    A.    The Breach of Contract Counterclaim Should be Dismissed Because it Conflicts With the Clearing Agreement and Governing Law ...................... 12

        1.    LJM has not identified a contractual provision that was violated ............................................................... 12

        2.    The Clearing Agreement authorized liquidation of LJM's accounts........................................................... 12

        3.    LJM's counterclaim is incompatible with settled law ....................... 15

    B.    The Breach of Implied Covenant of Good Faith and Fair Dealing Counterclaim Should be Dismissed Because it is Duplicative of the Breach of Contract Counterclaim and Otherwise Fails as a Matter of Law ....................................................... 19

    C.    The Breach of Fiduciary Duty Counterclaim Should be Dismissed Because it is Barred by the Agreement and Conflicts With Governing Law ....................................................... 21

    D.    The Negligence Counterclaim Should be Dismissed Because it is Barred by the Clearing Agreement and Fails as a Matter of Law ............... 23

    E.    The Clearing Agreement Bars LJM's Request for Punitive Damages ........ 24

CONCLUSION ................................................................... 24

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ADM Investor Services, Inc. v. Collins*,
   515 F.3d 753 (7th Cir. 2008) ....................................................................4, 5, 6, 7

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
   671 F.3d 140 (2d Cir. 2011) (per curiam)...............................................................11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................................11

*Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*,
   2015 WL 4940126 (S.D.N.Y. Aug. 10, 2015).........................................................11

*In re Bayer Corp. Combination Aspirin Prods. Marketing & Sales Practices Litig.*,
   701 F. Supp. 2d 356 (E.D.N.Y. 2010) ....................................................................4

*Citibank, N.A. v. Tormar Assocs. LLC*,
   2015 WL 7288652 (S.D.N.Y. Nov. 17, 2015).........................................................20

*Fesseha v. TD Waterhouse Investor Servs., Inc.*,
   747 N.Y.S.2d 676 (N.Y. Sup. 2002)...................................................................20, 21

*Fesseha v. TD Waterhouse Investor Servs., Inc.*,
   761 N.Y.S.2d 22 (App. Div. 2003).........................................................................20

*First American Discount Corp. v. Jacobs*,
   756 N.E.2d 273 (Ill. Ct. App. 2001) ............................................................ *passim*

*Geldermann & Co., Inc. v. Lane Processing, Inc.*,
   527 F.2d 571 (8th Cir. 1975) ...................................................................................6

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
   62 F.3d 69 (2d Cir. 1995)........................................................................................11

*Integrated Constr. Enters., Inc. v. Gn Erectors, Inc.*,
   2016 WL 7174061 (S.D.N.Y. Dec. 8, 2016) .....................................................15, 20

*Krys v. Pigott*,
   749 F.3d 117 (2d Cir. 2014).....................................................................................11

*LJL 33rd Street Assocs., LLC v. Pitcairn Props. Inc.*,
   725 F.3d 184 (2d Cir. 2013).....................................................................................21

*Merryman v. J.P. Morgan Chase Bank, N.A.*,
   2016 WL 5477776 (S.D.N.Y. Sept. 29, 2016)........................................................................24

*In re MF Global Inc.*,
   531 B.R. 424 (Bankr. S.D.N.Y. 2015) ...................................................................................19

*Morgan Stanley & Co., Inc. v. Peak Ridge Master SPC Ltd.*,
   930 F. Supp. 2d 532 (S.D.N.Y. 2013).............................................................................. *passim*

*Moss v. J.C. Bradford & Co.*,
   446 S.E.2d 799 (N.C. 1994)......................................................................................................8

*Negrete v. Citibank, N.A.*,
   187 F. Supp. 3d 454 (S.D.N.Y. 2016).....................................................................12, 20, 24

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*,
   754 F. Supp. 2d 616 (S.D.N.Y. 2010).....................................................................................13

*Sherman v. Sokoloff*,
   570 F. Supp. 1266 (S.D.N.Y. 1983).......................................................................................23

*Underdog Trucking, LLC v. Verizon Servs. Corp.*,
   2010 WL 2900048 (S.D.N.Y. July 20, 2010) .......................................................................20

*VTR, Inc. v. Goodyear Tire & Rubber Co.*,
   303 F. Supp. 773 (S.D.N.Y. 1969) ........................................................................................21

**Statutes**

7 U.S.C. § 6d(a)(2)...........................................................................................................................7

11 U.S.C. § 766(h) ...........................................................................................................................7

**Other Authorities**

17 C.F.R. § 1.3(p) ...........................................................................................................................23

CFTC Regulation 39.13 ....................................................................................................................6

CFTC Regulation 39.13(g)(8)(i)(A) .................................................................................................6

CFTC Regulation 39.13(g)(8)(ii) .....................................................................................................6

CME Group, CME Clearing Risk Management & Financial Safeguards .............................5, 6, 9

CME Rule 804 ...................................................................................................................................5

CME Rule 814 .............................................................................................................................6, 14

CME Rule 930.D ...........................................................................................................6

CME Rule 930.E ...........................................................................................................6

CME Rule 930.K ........................................................................................................7, 9

Federal Rule of Civil Procedure 12(b)(6) ................................................................11

Futures Industry Association, *Protection of Customer Funds: Frequently Asked Questions* (4th ed. Nov. 2014) ................................................................................7

Philip McBride Johnson & Thomas Lee Hazen, *Derivatives Regulation* (2004)...................5, 6, 7

## PRELIMINARY STATEMENT

Following the dramatic drop in the stock market in early February 2018, defendant LJM Investment Fund, L.P. ("LJM") failed to pay Wells Fargo Securities, LLC ("WFS") more than $16 million to cover losses in LJM's derivatives account. WFS sued LJM for breach of contract.

LJM and several of its affiliates responded by filing this Counterclaim. Although WFS's role as a clearing futures commission merchant ("FCM") under the federal regulatory scheme is very narrow, and the parties' contracts expressly state that LJM, not WFS, is responsible for any trading losses, the Counterclaim seeks to hold WFS liable for LJM's large losses.

LJM admits that on February 5, 2018, there was an "extreme," "sudden," "extraordinary market event"—"Vol-mageddon"—which put LJM at risk of losing hundreds of millions of dollars, all guaranteed by WFS. Counterclaim ¶¶ 15, 29. LJM's theory is that its accounts had incurred only "temporary paper losses," and WFS had no right to "terminate[] the parties' [FCM] agreement and order[] an immediate liquidation of LJM's entire portfolio." *Id.* ¶ 2. Rather, WFS supposedly was required to continue to guarantee LJM while it kept trading, hoping the market would improve so that LJM could "contain its . . . losses." *Id.*

Assuming the truth of LJM's allegations, LJM's Counterclaim still does not state a claim under any theory. Under the parties' agreements and the federal regulatory scheme governing derivatives trading, LJM was required to make a final settlement of all prior-day losses, so LJM had incurred real, not paper, losses. Moreover, neither the parties' contracts nor governing law required WFS to continue to guarantee LJM, risking even larger losses, while LJM kept trading in the hope that the market would reverse direction. To the contrary, under the contracts and the federal regulatory scheme, WFS had an absolute right to terminate LJM's contracts and compel LJM to close out or transfer its accounts to another FCM immediately. Moreover, settled case law establishes that LJM has no right second-guess the manner in which its account was liquidated.

1

LJM's theory is incompatible with the entire federal regulatory scheme, which is designed to protect the guarantor FCMs, other customers of FCMs, and the markets. To our knowledge, no court has endorsed a theory like LJM's, and this Court should not be the first. LJM's Counterclaim should be dismissed with prejudice.

## I.    THE COMPLAINT AND COUNTERCLAIMS

WFS sued LJM and its general partner for breach of contract.[1] The Complaint alleges that WFS cleared derivatives trades for LJM on the Chicago Mercantile Exchange ("CME") (Compl. ¶¶ 9, 11), that in the first week of February 2018, "LJM's trading resulted in heavy losses in the derivatives market" (*id*. ¶ 16), and that LJM breached its Futures and Cleared Swaps Agreement[2] with WFS by refusing to repay WFS more than $16 million in losses incurred by LJM's account (*id*. ¶¶ 18, 19, 29).

LJM's answer admits that WFS "acted as its clearing FCM" pursuant to the Clearing Agreement (Answer ¶¶ 9, 11), and that on February 5, 2018 "LJM sustained unrealized paper losses" in its CME accounts (*id*. ¶¶ 10, 16).  But LJM "den[ies] that [it was] required to pay [WFS] for margin payments or losses paid by [WFS] to the CME" (*id*. ¶¶ 9, 21), alleging that "by letter dated February 5, 2018 [WFS] terminated the parties' Agreement" (*id*. ¶ 17).

In its Counterclaim, LJM admits that it "suffered significant unrealized losses on February 5," and that "[d]uring the evening of February 5, [WFS] sent out a position statement and margin request." Counterclaim ¶¶ 19, 21. (The margin call was for more than $100 million. Compl., Ex. 3.)

---

[1]     For simplicity, except with respect to WFS's Complaint, this brief refers to LJM Investment Fund, L.P. and the rest of the counterclaimants collectively as "LJM."

[2]     This brief refers to all of the clearing agreements executed by LJM, which are identical, collectively as a singular "Clearing Agreement" or "Agreement."

LJM's Counterclaim does not assert that LJM paid the requested margin. Rather, LJM alleges that "by a formal letter, sent [on February 6] at 7:36 a.m., [WFS] expressly terminat[ed] the [Clearing] Agreements as of right under Section 24 of the Agreements" and thereby "lost its right to demand margin after terminating the Agreements." Counterclaim ¶¶ 22, 34. LJM's Counterclaim further alleges that WFS improperly terminated the Clearing Agreement, and then improperly forced LJM to "liquidate its portfolios immediately." *Id*. ¶ 22.[3]

The gist of LJM's Counterclaim is that LJM's account had only "unrealized paper losses" (*id*. ¶ 16), and therefore WFS could not demand margin, terminate the Agreement, or force LJM to liquidate its accounts. Rather, because LJM supposedly "was in the best position to contain the scope of the losses" (*id*. ¶ 19), WFS had to "allow[] LJM time to execute its well-conceived plan to contain its temporary paper losses until the market normalized." *Id*. ¶¶ 2, 20. Using hindsight (*e.g.*, *id*. ¶ 19 ("If the markets stabilized and recovered (as they did) . . . .")), LJM alleges that liquidating its portfolio resulted in losses of "more than $266 million across all managed and affiliated funds—at least $115 million more than if LJM had been allowed to apply its trading procedures." *Id*. ¶ 29.

LJM's assertion that WFS forced the liquidation of LJM's accounts is not true. In reality, LJM chose to liquidate and the manner in which the liquidation was done. However, accepting LJM's allegations as true, as is required on a motion to dismiss, LJM's Counterclaim still must be dismissed as a matter of law. Under the federal regulatory scheme governing derivatives trading and the Clearing Agreement that LJM signed, WFS absolutely was entitled to terminate its agreements with LJM and force LJM to either liquidate its accounts or transfer them to other FCMs. LJM's Counterclaim—which asserts that LJM was entitled to continue trading, to

---

[3]    In fact, WFS's termination letter, in accordance with the Clearing Agreement (Counterclaim ¶¶ 13, 40), says, "Please promptly close out or transfer any open positions in the account." Ex. 1.

"manage [its] own book," hoping the market would recover, while WFS, and potentially other customers at WFS, the CME, its clearing members, and the market as a whole assumed the risk of further losses (*id.* ¶¶ 2, 41)—is incompatible with the governing contract and settled law, and therefore should be dismissed with prejudice.

## II.    BACKGROUND

### A.    The Federal Regulatory Scheme[4]

Derivatives trading in the United States is governed by comprehensive federal regulation, including the Commodity Exchange Act ("CEA") and the rules and regulations of the Commodity Futures Trading Commission ("CFTC"), the National Futures Association ("NFA"), and the applicable exchange, here the Chicago Mercantile Exchange ("CME").[5] The Clearing Agreement that each LJM entity executed expressly incorporates these laws, rules, and regulations. Clearing Agt. ¶ 1 (LJM's account is "subject to" the federal regulatory scheme).

The fundamental purpose of the "federal regulatory scheme" is to ensure smooth, uninterrupted functioning of the market by "afford[ing] [futures commission] merchants and commodities exchanges with maximum protection." *First American Discount Corp. v. Jacobs*, 756 N.E.2d 273, 280 (Ill. Ct. App. 2001) (quoting *Moss v. J.C. Bradford & Co.*, 446 S.E.2d 799, 808 (N.C. 1994)). The regulatory scheme protects the market through five interrelated mechanisms.

---

[4]        The facts contained in this section are properly subject to judicial notice on a motion to dismiss because they "provide context and a means of measuring [WFS's] conduct," and do not "resolve a crucial factual issue." *In re Bayer Corp. Combination Aspirin Prods. Marketing & Sales Practices Litig.*, 701 F. Supp. 2d 356, 368 (E.D.N.Y. 2010). Furthermore, these facts "are 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned,' widely recognized, and incorporated into federal regulations and leading cases." *Id.* (quoting Fed. R. Evid. 201(b)**)**.

[5]        "The Commodity Exchange Act requires futures commission merchants to abide by a board of trade's rules . . . ." *ADM Investor Services, Inc. v. Collins*, 515 F.3d 753, 755 (7th Cir. 2008).

4

First, when a buyer and seller contract with each other directly, there is a "risk of nonperformance, usually called the 'counterparty risk.'" *ADM Investor Servs.*, 515 F.3d at 756. One way the regulatory scheme mitigates this risk is to require that buyers and sellers contract "*through a clearing corporation*," in this case the CME, "which then becomes the counterparty of each original party." *Id.* (emphasis added); *see* CME Rule 804 ("[E]ach clearing member shall be deemed to have bought the contracts from or sold the contracts to the Clearing House."). Thus, "CME Clearing mitigates counterparty risk through becoming the counterparty to both sides of the transaction." CME Group, CME Clearing Risk Management & Financial Safeguards 5, *available at* http://www.cmegroup.com/clearing/files/financialsafeguards.pdf (last visited June 7, 2018) [hereinafter "CME Clearing Risk Mgmt."].

Second, the regulatory scheme reduces the risk to the market by providing that buyers and sellers, such as LJM, "must be represented by" a clearing FCM such as WFS. CME Clearing Risk Mgmt. 5. The clearing FCM "is accountable to CME Clearing as the guarantor for payment and performance bond obligations arising from the accounts it clears." *Id*. This arrangement protects "clearing corporations" and the exchanges, such as the CME, because "futures commission merchants . . . generally are substantial businesses." *ADM Investor Servs.*, 515 F.3d at 756.

Third, the regulatory scheme reduces the "risk of massive default . . . through a system variously known as daily *marking to the market* or *settlement*." Philip McBride Johnson & Thomas Lee Hazen, Derivatives Regulation, § 2.06[11] at 492 (2004) [hereinafter "Johnson & Hazen"].[6] Thus, CME rules expressly require that "settlement for any outstanding exposure shall

---

[6]     Under the daily settlement system, "[a]fter the close of the market each day, the clearing agency computes the day's net gain or net loss sustained by the open positions held by each of its clearing members. . . . If . . . a clearing member's open positions register a net gain for the day, the clearing agency will pay that amount to the clearing member. If a clearing member's open positions at day's end have registered a net loss, the clearing agency will collect that amount from the clearing member." Johnson & Hazen § 2.06[11] at 492-93.

be made with the Clearing House . . . at least once each Business Day." CME Rule 814. The CME rules further provide that "[a]ll payments in satisfaction of outstanding exposures must be paid in cash . . . and shall be final, irrevocable and unconditional." *Id*. As is explained below, the CME's daily settlement system completely undermines LJM's repeated assertions that its accounts suffered only "unrealized paper losses." *E.g.*, Counterclaims ¶¶ 16, 19, 20.

Fourth, the regulatory scheme reduces the "risk of nonperformance . . . in derivatives markets" by requiring payment of "margin." *ADM Investor Servs.*, 515 F.3d at 756.[7] Thus, the CME Rules provide that a clearing FCM may accept orders only if the account already has a "sufficient performance bond [margin]" or if the margin "is forthcoming within a reasonable time," and that a clearing FCM "may not accept orders for an account that has been in debit an unreasonable time." CME Rule 930.D. CME Rules further provide that clearing members "must issue calls for performance bond [margin] that would bring an account up to the initial performance bond requirement" and "may call for additional performance bond at their discretion." CME Rule 930.E.[8] As noted in *Geldermann & Co., Inc. v. Lane Processing, Inc.*, 527 F.2d 571, 577 (8th Cir. 1975), a "merchant could be fined if its customers' accounts [are] inadequately margined."

---

[7]      "[*E*]*ach* party (seller as well as buyer) is required . . . to deposit with his broker a certain sum of money . . . in the nature of a performance bond," which is "called a margin." Johnson & Hazen § 1.02[13] at 111. CFTC regulations require clearing FCMs to collect margin. CFTC Regulation 39.13(g)(8)(i)(A) ("A derivatives clearing organization shall collect initial margin on a gross basis for each clearing member's customer accounts . . . ."); CFTC Regulation 39.13(g)(8)(ii) ("A derivatives clearing organization shall require its clearing members to collect customer initial margin, as defined in §1.3 of this chapter, from their customers, for non-hedge positions, at a level that is greater than 100 percent of the derivatives clearing organization's initial margin requirements with respect to each product and swap portfolio."). Likewise, "contract market rules generally prohibit members from accepting trades without adequate margin, and from carrying trades that have become undermargined. The members are expected to make prompt and diligent margin calls whenever necessary." Johnson & Hazen § 2.06[2] at 451-52.

[8]      The CME establishes minimum standards for the performance bond (margin), which "[i]n compliance with CFTC Regulation 39.13," is intended to cover "99% of the potential price moves for a product or portfolio of products over a minimum of one-day for futures and options on futures." CME Clearing Risk Mgmt. 10. CME Rules further provide that "Clearing Members may impose more stringent performance bond requirements on their customers than the minimums established by CME Clearing, due to the greater visibility they have into the credit risk profiles of their customers." *Id*.

The "margin requirements in futures markets are not designed to protect investors . . . from adverse price movements." *ADM Investor Servs.*, 515 F.3d at 756. Rather, "[t]he purpose of margin call rules is to protect brokers from the risks associated with insufficiently secured accounts, and to prevent customers from carrying vast exposure in their accounts without adequate capital to cover their positions." *Morgan Stanley & Co., Inc. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 539 (S.D.N.Y. 2013) (quoting *Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.*, 794 F. Supp. 1265, 1275-76 (S.D.N.Y. 1992)).

Fifth, the regulatory scheme authorizes immediate liquidation of risky accounts. Under exchange rules, "members are either directed or authorized to liquidate under-margined futures positions if margin calls are not satisfied within a reasonable time," which may be as short as "a few minutes." Johnson & Hazen § 2.06[2] at 452; *accord* CME Rule 930.K ("[T]he clearing member may deem one hour to be a reasonable time" to comply with a margin call). Moreover, CME Rules require clearing firms to "maintain full discretion to determine when and under what circumstances positions in any account shall be liquidated." CME Rule 930.K.

This discretion safeguards the solvency of FCMs, not only to protect the clearing houses, but also to protect the FCMs' *customers* against what is known as "fellow-customer risk." Customer funds must be held separately from an FCM's own assets, but may be commingled with each other. 7 U.S.C. § 6d(a)(2). As a consequence, if the default of one or more customers forces an FCM into bankruptcy, "non-defaulting customers . . . will share in any shortfall, *pro rata*" under the Bankruptcy Code. Futures Industry Association, Protection of Customer Funds: Frequently   Asked   Questions   6   (4th   ed.   Nov.   2014),   *available   at* https://secure.fia.org/downloads/pcf_questions.pdf (last visited June 15, 2018); *see* 11 U.S.C. § 766(h). It is to protect clearing houses and non-defaulting customers, therefore, that "under the

federal regulatory scheme, a broker is permitted to liquidate an under-margined account without prior notice." *First American*, 756 N.E.2d at 299; *Moss*, 446 S.E.2d at 808 ("[T]he pervasive federal regulatory paradigm in the area of futures trading . . . is designed to afford maximum protection to the commodities merchants and the commodities exchanges themselves and therefore permits the liquidation of a customer's under-margined account without prior demand or notice.") (emphasis omitted).

### B.      The LJM/WFS Clearing Agreement

The Clearing Agreement incorporates the federal regulatory scheme by making the contract "subject to" the federal scheme (Clearing Agt. ¶ 1) and expressly making those requirements contractual obligations. Thus, the Clearing Agreement obligates LJM to pay margin and trading losses promptly (*id.* ¶¶ 10, 11), entitles WFS to liquidate LJM's account if LJM fails to pay (*id.* ¶¶ 18, 19), and requires LJM to pay any remaining deficiency (*id.* ¶¶ 11, 19(h)). Moreover, the Agreement may be terminated at will, and upon receipt of a notice of termination, LJM must promptly liquidate its account or transfer its open positions to another FCM. *Id.* ¶ 24.

The important provisions of the Clearing Agreement are as follows:

First, the Clearing Agreement states that LJM's account is "subject to" the regulatory scheme (which it defines as "Applicable Law"), and expressly provides that WFS "shall not be liable as a result of any action taken or failed to be taken . . . in order to comply with Applicable Law." *Id.* ¶ 1.

Second, the Clearing Agreement provides that LJM must "at all times maintain sufficient" margin, that "[m]argin requirements imposed by WFS may exceed those of other intermediaries," and that "WFS may demand [m]argin . . . from [LJM] orally, telephonically, or in writing, including by electronic communications*." Id.* ¶ 10. The Agreement (¶ 1) also incorporates the

CME Rules, which provide that a "clearing member may deem one hour to be a reasonable time" to comply with a margin demand. CME Rule 930.K.

Third, the Clearing Agreement provides that "[LJM] and not WFS is responsible and liable for any losses" in the account. Clearing Agt. ¶ 2; *accord id*. ¶ 11 (LJM must pay "any trading losses, . . . debit balance, deficiency, or other liability related to the Account," as well as "any other charges or costs incurred by WFS with respect to the Account, including, but not limited to, reasonable attorneys' fees incurred in collecting any unpaid debit balance or deficiency").

Fourth, the Clearing Agreement provides that if LJM "fails to comply with any provision of, or perform any obligation under, this Agreement," that failure "shall be deemed an 'Event of Default.'" *Id.* ¶ 18. Paragraph 19 of the Agreement provides that following any "Event of Default, WFS shall have the right, . . . in addition to any other remedy available under Applicable Law, to" do any of the following:

> (a) *cancel, suspend or refuse or, in its discretion, continue to execute . . . any orders*; (b) *close out, liquidate, terminate or net at such time as WFS deems appropriate, any or all open Derivatives* and other positions . . . in [LJM's] Account; . . . (g) *terminate any or all of WFS's obligations* for future performance to [LJM]; and (h) *take such other actions as Wells Fargo, in its discretion, deems necessary or appropriate for its protection, all without additional demand for Margin and without notice* or advertisement.

*Id.* ¶ 19, *as amended by* Clearing Agt., First Am. ¶ 4 (emphasis added).[9]

Fifth, in recognition that, as a clearing FCM, WFS is a "guarantor for payment and performance bond [margin] obligations" for the benefit of the CME (CME Clearing Risk Mgmt.

---

[9]      The Agreement further provides that "[a] prior demand or Margin call of any kind from WFS, prior notice from WFS or the failure to previously enforce any provision of this Agreement or any other agreement shall not be considered a waiver of Wells Fargo's right to take any action as described herein without notice or demand," "that Wells Fargo shall not be deemed to have breached any obligation if no notice is given," and that LJM "shall be liable for the payment of any deficiency remaining in the Account after such actions are taken by Wells Fargo, together with interest thereon and all costs relating to actions taken by Wells Fargo (including reasonable attorneys' fees) and any fees and expenses owed in the Account." Clearing Agt. ¶ 19(h).

5), the Clearing Agreement strictly limits WFS's obligations and liability to LJM. Thus, it expressly provides that WFS (1) "*is not acting as a fiduciary* . . . with respect to [LJM] or any Account" (Clearing Agt. ¶ 2 (emphasis added); *accord id*. ¶ 4(a) (WFS is "not . . . responsible for compliance with any law or regulation governing the conduct of fiduciaries")); (2) is "not . . . responsible and liable for any losses arising from Derivatives entered into in [LJM's] Account" (*id*. ¶ 2); (3) is not liable for "any loss, liability, damage or expense except to the extent that such loss, liability, damage or expense arises from its gross negligence or willful misconduct" (*id*. ¶ 22);[10] (4) is not liable "in connection with the performance or non-performance by any third-party (including, but not limited to, . . . brokers [or] dealers . . .) with respect to any Derivatives . . . ," which includes "without limitation if any such third-party makes an error in executing, filling or settling orders." (*id*.);[11] and (5) is not liable for "consequential, incidental, special or punitive damages" (*id.*).

Finally, and most important here, the Clearing Agreement expressly provides that it "may be terminated at any time by [LJM] or WFS by written notice to the other," but that "[t]ermination . . . shall not relieve either party of any obligations in connection with any debit or credit balance or other liability or obligation incurred prior to such termination*." Id.* ¶ 24. The Agreement further provides that, "[i]n the event of a notice terminating this Agreement, [LJM] shall either close out open positions in the Account or arrange for such open positions to be

---

[10]     Paragraph 23 of Clearing Agreement provides that LJM indemnifies Wells Fargo for "for reasonable costs of counsel and the cost of any investigation and preparation . . . in connection with any claim . . . relating to this Agreement or of any Derivative, except for such losses, costs or damages as are directly caused by . . . Wells Fargo['s] own gross negligence or willful misconduct." Clearing Agt. ¶ 23.

[11]     Paragraph 7 of the Clearing Agreement similarly provides that WFS shall have no "liability with respect to any give-ups or for any actions or inaction taken by the executing broker or Customer." Clearing Agt. ¶ 7.

transferred to another FCM promptly."[12] *Id.* When all open positions have been "close[d]" or "transfer[red] to another FCM" and all of LJM's "liabilities to [WFS]" have been satisfied, the "Agreement shall terminate." *Id.*

## III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility." *Id.* (internal quotation marks omitted). And where an "allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) (per curiam). "[T]he Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context." *Krys v. Pigott*, 749 F.3d 117, 129 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 686).

In deciding this motion to dismiss, the Court may consider the parties' contract, even though it was not attached to the counterclaim. *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995). The Court also may consider the termination letter WFS sent to LJM, which LJM referenced but did not attach (Counterclaim ¶ 22), because LJM "relied upon [the letter] in framing the complaint." *Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*, 2015 WL 4940126, at *7 (S.D.N.Y. Aug. 10, 2015) (quotation omitted) (considering letter terminating contract on motion to dismiss).

---

[12]     Even absent termination, the Clearing Agreement gives WFS "the right, whenever in its reasonable discretion it deems such action necessary or desirable and upon reasonable notice to [LJM], to limit the size of open positions . . . and to refuse to accept any orders to establish new positions." Clearing Agt. ¶ 15.

IV.    **ARGUMENT**

A.    **The Breach of Contract Counterclaim Should be Dismissed Because it Conflicts With the Clearing Agreement and Governing Law.**

LJM's Counterclaim alleges that WFS breached the Clearing Agreement because "instead of permitting [LJM] to manage [its] own book" (Counterclaim ¶ 41), WFS "invoked the termination clause in Section 24" (*id.* ¶ 39) and then "coerced [LJM] into liquidating [its] portfolios in a commercially unreasonable manner" (*id*. ¶ 41). LJM claims that it should have been "allow[ed] . . . time to execute its well-conceived plan to contain its temporary paper losses," that WFS "precipitously terminated the parties' futures commission merchant agreement and ordered an immediate liquidation of LJM's entire portfolio" (*id.* ¶ 2), and that if LJM had "been permitted to manage [its] portfolio," its losses would have been much smaller. *Id*. ¶ 43. These allegations fail to state a breach of contract claim as a matter of law.

1.    **LJM has not identified a contractual provision that was violated.**

LJM has not specified precisely which terms of the Clearing Agreement WFS supposedly breached and how WFS breached them. In the Second Circuit and this District, a "breach of contract claim will be dismissed . . . where the plaintiff fails to allege, in a nonconclusory fashion . . . the specific provisions of the contract upon which liability is predicated." *Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 468 (S.D.N.Y. 2016) (quotation omitted) (dismissing complaint). This defect alone warrants dismissal, and as the next section shows, LJM cannot amend its way around this fundamental defect.

2.    **The Clearing Agreement authorized liquidation of LJM's accounts.**

Contrary to LJM's assertion, WFS's alleged conduct is expressly authorized by—indeed, at the very core of—the Clearing Agreement and the governing regulatory scheme. Nothing in the Agreement prohibits "precipitous[] terminat[ion]" of the Agreement or "immediate liquidation"

of LJM's accounts, and nothing gives LJM the right to extra "time to execute its well-conceived plan to contain its temporary paper losses." Counterclaim ¶ 2.

First, although LJM complains about the "precipitous[] terminat[ion]" of the Clearing Agreement (*id.* ¶¶ 2, 39), this was *not* a breach of the Agreement. Rather, the Agreement expressly provides that it "may be terminated at any time." Clearing Agt. ¶ 24.

Second, although LJM complains that WFS "ordered an immediate liquidation" without giving "LJM time to execute its well-conceived plan to contain its temporary paper losses until the market normalized" (Counterclaim ¶ 2), this too was *not* a breach of the Agreement. Rather, it is expressly authorized by the Agreement.

In the first place, the Agreement expressly provides that once LJM receives WFS's termination notice (which LJM admits it received, *id.* ¶ 22), LJM must either "*close out open positions in the Account* or arrange for such open positions to be transferred to another FCM *promptly.*" Clearing Agt. ¶ 24 (emphasis added). LJM concedes this. Counterclaim ¶ 40. Although LJM admits that it already had accounts with "three other FCMs" (*id.* ¶ 22), LJM does not allege that it tried to transfer its open positions to another clearing FCM, let alone that another FCM would have been willing to assume such an enormous risk. LJM's only option, therefore, was to "close out open positions in the Account . . . promptly." Clearing Agt. ¶ 24. At most, then, LJM was "forced" to comply with its express obligations under the Clearing Agreement. That is *not* a breach of contract. *See Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 627 (S.D.N.Y. 2010) ("[B]eing forced to comply with contractual obligations that a party voluntarily entered into is simply not the sort of 'damage' that is compensable at law."); *Peak Ridge*, 930 F. Supp. 2d at 538 (dismissing counterclaim alleging improper liquidation of account,

holding that "[w]here, as here, a contract is clear and unambiguous, the parties are bound by the language contained in the document").

Independently, under the Clearing Agreement and the regulatory scheme, once LJM breached its contractual obligation to maintain the required margin, WFS was entitled to insist on prompt liquidation of LJM's accounts. Clearing Agt. ¶¶ 18, 19. LJM's arguments to the contrary are without merit.

As a threshold matter, there is no "paper losses" exception to LJM's contractual obligations to pay for margin (Clearing Agt. ¶ 10), "trading losses," "or other liability related to the Account" (*id*. ¶ 11). Moreover, because the CME requires daily settlement, LJM's losses were *not* merely "paper losses." To the contrary, they were very real losses that WFS guaranteed and had to pay to the CME every trading day. See pp. 5-6, *supra*; CME Rule 814.

Nor does the Clearing Agreement excuse LJM's contractual obligations based on LJM's assertion that some of its trades "were not fully processed by the executing brokers and reflected in statements of LJM's accounts with [WFS]." Counterclaim ¶ 17. To the contrary, the Clearing Agreement provides that WFS is not responsible for "any . . . third party [broker] . . . error[s] in executing, filling, or settling orders." Clearing Agt. ¶ 22.

LJM concedes that WFS demanded margin on February 5, 2018 (Counterclaim ¶ 21), and does not allege that it fully satisfied those margin calls or the resulting debit, which persists to this day. Rather, LJM asserts that WFS "lost its right to demand margin after terminating the Agreements." *Id.* ¶ 34. But the express terms of the Clearing Agreement demolish this assertion.

In the first place, the termination notices did *not* excuse LJM's contractual obligations. Those notices merely began the termination process, by (among other things) requiring LJM to liquidate or transfer its accounts promptly. See p. 10, *supra*; p. 22, *infra*. The Clearing Agreement

14

expressly provides that LJM's "satisfaction of all of [its] liabilities to [WFS]" is a prerequisite to termination. Clearing Agt. ¶ 24 ("Upon satisfaction of all of [LJM's] liabilities to [WFS] . . . this Agreement shall terminate.").

Moreover, the Clearing Agreement provides that even after termination, LJM *remains liable for* "*any obligations* in connection with any debit or credit balance or other liability or obligation *incurred prior to such termination.*" *Id.* ¶ 24 (emphasis added); *accord id.* ¶ 19(h) (LJM remains "liable for the payment of any deficiency remaining in the Account after such actions are taken by Wells Fargo"). Thus, the termination notices did *not* excuse LJM's contractual obligations, and in the event of a breach, the Clearing Agreement authorizes WFS to "close out, *liquidate,* [or] terminate . . . *at such time as WFS deems appropriate*, any or all open Derivatives . . . in [LJM's] Account." Clearing Agt., First Am. ¶ 4 (emphasis added).

In short, LJM asserts that WFS breached the Clearing Agreement by "precipitously terminat[ing]" the Agreement and insisting on "immediate liquidation," thereby denying LJM "time to execute its well-conceived plan to contain its . . . losses." Counterclaim ¶ 2. In reality, there was no breach of contract because the Clearing Agreement expressly gives WFS the right to terminate the Agreement and, absent a transfer to another FCM, to force the immediate liquidation of the accounts. *Integrated Constr. Enters., Inc. v. Gn Erectors, Inc.*, 2016 WL 7174061, at *3 (S.D.N.Y. Dec. 8, 2016) (Forrest, J.) (dismissing breach of contract claim because plaintiff "failed to allege breach of [the] agreement").

### 3.   LJM's counterclaim is incompatible with settled law.

LJM is not the first trader that has tried to defend against a clearing FCM's deficiency claim by bringing a counterclaim alleging that the FCM precipitously liquidated the account in an unreasonable manner, thereby increasing the trading losses. But courts reject these claims because

they are wholly incompatible with both the federal regulatory scheme and the contracts governing derivatives trading.

*Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*, which granted a motion to dismiss a counterclaim, is particularly applicable. The FCM (Morgan Stanley) sued its customer to recover for losses in the customer's account. Like LJM, the customer responded by filing a counterclaim that alleged, *inter alia*, that the FCM breached the contract by (1) improperly liquidating the account, and (2) "failing to exercise its liquidation remedies in a commercially reasonable manner," when if it had "traded more judiciously" it could have "avoid[ed] destroying the value of the account." 930 F. Supp. 2d at 537. Relying on the federal regulatory scheme, which also applies here, and contractual provisions equivalent to those in the Clearing Agreement, the district court categorically rejected these arguments.

First, the court rejected the argument that it was improper to liquidate the account, explaining that, "[d]ue to the volatile nature of the commodities market, FCMs can be responsible to the exchange for risky positions taken by their customers. This assumption of responsibility, in turn necessitates the ability of FCMs to maintain control over the accounts they guarantee." *Id*. at 539.

Second, the court rejected the customer's argument that the FCM "did not exercise its remedies in a commercially reasonable manner" and "could have traded differently and more judiciously so as not to destroy the value of the positions." *Id*. at 541. The court ruled that the FCM "is not required . . . to choose the most beneficial trading strategy for [the customer], as the right to liquidate is for the benefit of [the FCM] in protecting itself against high-risk positions." *Id*. Moreover, it is inappropriate to "second-guess [an FCM's] trading based on hindsight." *Id*. (citing *Capital Options Invs., Inc. v. Goldberg Bros. Commodities, Inc.*, 1990 WL 180583, at *6

(N.D. Ill. Nov. 5, 1990), *aff'd*, 958 F.2d 186 (7th Cir. 1992) ("We are not equipped to second-guess, especially with the benefit of hindsight, the business judgments of professional traders and brokers regarding the risks associated with any given position or the volatility and direction of any future market movements.")). LJM's complaints about the liquidation strategy, including the "bulk sale of . . . E-mini futures" (Counterclaim ¶ 23), do not state a claim under this principle.

The *Peak Ridge* court dismissed the entire counterclaim, with one exception: the customer alleged that the liquidation "was not an arms-length transaction" and "created a conflict of interest" because Morgan Stanley liquidated "by executing trades in the account by *private transaction where the opposite party was* [*a*] . . . [*Morgan Stanley*] *account*," and the private transaction trades were "more favorable to [Morgan Stanley] than the traded price on the exchange that day." 930 F. Supp. 2d at 542-43 (emphasis added). The *Peak Ridge* court said that those specific conflict of interest allegations based on an allegedly not "arms-length," "private transaction"—and *only* those allegations—were sufficient to state a breach of contract claim. *Id*.

Nothing remotely like this is alleged in this case. All of the relevant trades, including the sale of E-mini futures (Counterclaim ¶ 23), were executed at arm's length on the open market. LJM's breach of contract theory is that, notwithstanding the large losses LJM already sustained while following its trading and risk management strategies and the enormous risks its accounts still faced, WFS was not entitled to force liquidation. Instead, according to LJM, WFS was required to continue guaranteeing LJM's trading while LJM tried "to execute its well-conceived plan to contain its . . . losses until the market normalized." *Id.* ¶ 2. As explained above, these are precisely the kind of allegations that *Peak Ridge* holds do not state a claim for breach of contract.

Another case practically "on all fours" with this one is *First American Discount Corp. v. Jacobs*, which rejected all of the claims LJM makes here as a matter of law. Like this case, *First*

17

*American* arose from what was then "the worst single-day point drop in the history of the U.S. stock market." 756 N.E.2d at 275. Like this case, the customer's account at the CME was liquidated. *Id.* And like this case, after the FCM sued for failure to pay for trading losses, the customer counterclaimed, alleging that the liquidation of his account was improper, that "the market subsequently recovered . . . by the end of the next day," and that the FCM therefore was responsible for the losses in the account. *Id.* at 277.

The trial court accepted the customer's arguments, but the appellate court *reversed* and entered judgment for the FCM. The court held that the FCM "was . . . *entitled to liquidate the defendants' positions . . . . as a matter of law*" because "the federal regulatory scheme governing margin calls and account liquidation permit[s] the liquidation of a customer's account without prior demand or notice." *Id.* at 279-80 (emphasis added). The court explained that "the federal regulatory scheme is designed to afford merchants and commodities exchanges with maximum protection" because it is "imperative that futures merchants be able to act quickly and decisively to liquidate a customer's account when . . . a precipitously declining market demands such action." *Id.* at 280 (quoting *Moss*, 446 S.E.2d at 808). Even if the brokerage contract purported to limit the FCM's right to liquidate (not the case here), "a contract prohibiting immediate liquidation without notice would be unenforceable as being contrary to federal regulatory policy which mandates that such latitude be given to the broker." *Id.* at 283. Accordingly, liquidating the customer's account was not a breach of contract "as a matter of law." *Id.* at 279.

In short, under the federal regulatory scheme including CME rules, the Clearing Agreement, and unambiguous case law, LJM has not stated a claim for breach of contract. "[W]here the market was undisputably in steep decline . . . [and] even a minor delay could increase the risk for the broker as well as the exchange[,] [a] broker is not obliged to take risks on

behalf of a customer." *Id.* at 284. Moreover, WFS did not have to "liquidate [LJM's] account[s] in any particular manner," or even "adopt 'less drastic alternatives' than liquidation." *In re MF Global Inc.*, 531 B.R. 424, 436-37 (Bankr. S.D.N.Y. 2015) (quoting *Capital Options Invs.*, 1990 WL 180583, at *6). And WFS certainly had no obligation under the Clearing Agreement or governing law to defer taking action while LJM continued trading in an effort to "contain its . . . losses." Counterclaim ¶¶ 2, 41. LJM's breach of contract count is contrary to the law and the contract and should be dismissed.

> **B.     The Breach of Implied Covenant of Good Faith and Fair Dealing Counterclaim Should be Dismissed Because it is Duplicative of the Breach of Contract Counterclaim and Otherwise Fails as a Matter of Law.**

LJM's counterclaim for breach of the implied covenant of good faith and fair dealing (Count II), fails to state a claim as a matter of law for two independent reasons.

First, LJM's implied covenant count simply reiterates, largely verbatim, the allegations in the breach of contract claim and seeks precisely the same damages. Thus, the breach of contract and implied covenant counts virtually identically allege that, "Instead of permitting Counterclaimants to manage their own book, in breach of the Agreements, [WFS] recklessly coerced them into liquidating their portfolios in a commercially unreasonable manner." Counterclaim ¶¶ 41, 51 ("recklessly forced"). The damages allegations in the breach of contract and implied covenant counts also are identical: "The [WFS] liquidation and trades resulted in losses far greater than would have occurred had Counterclaimants been permitted to manage their portfolio as set forth in the Agreements." Counterclaim ¶¶ 43, 53.

LJM's implied covenant count does not state a claim because, under New York law, a "claim for breach of the implied covenant can survive a motion to dismiss only 'if it is based on allegations different than those underlying the accompanying breach of contract claim' and if the relief sought is not 'intrinsically tied to the damages allegedly resulting from

the breach of contract.'" *Integrated Constr. Enters.*, 2016 WL 7174061, at *3 (quoting *In re Refco Inc. Secs. Litig.*, 826 F. Supp. 2d 478, 496 (S.D.N.Y. 2011)) (dismissing implied covenant claim where it was "entirely redundant of the breach of contract claim"). "[C]ourts in this district have consistently dismissed claims based on the implied covenant of good faith where those claims duplicate a plaintiff's breach of contract theory." *Citibank, N.A. v. Tormar Assocs. LLC*, 2015 WL 7288652, at *7 (S.D.N.Y. Nov. 17, 2015). This is because "New York law 'does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.'" *Underdog Trucking, LLC v. Verizon Servs. Corp.*, 2010 WL 2900048, at *6 (S.D.N.Y. July 20, 2010) (quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002)). A duplicative implied covenant claim must be dismissed even if the related breach of contract claim also fails. *See Negrete*, 187 F. Supp. 3d at 470. Here, where the breach of contract and implied covenant claims rest on the same facts and seek the same relief, the implied covenant claim should be dismissed.

Second, an implied covenant claim is particularly inappropriate "[w]ith regard to margin agreements, which vest broker-dealers with broad discretion to liquidate." *Fesseha v. TD Waterhouse Investor Servs., Inc.*, 747 N.Y.S.2d 676, 680 (N.Y. Sup. 2002), *aff'd*, 761 N.Y.S.2d 22 (App. Div. 2003). Thus, in *Fesseha*, in which the customer alleged that the broker violated the implied covenant by improperly liquidating the account without giving the customer "notice and an opportunity to cure," the trial court rejected that claim, explaining that "failure to make a margin call is not necessarily arbitrary, capricious, or inconsistent with reasonable expectations." *Id.* The Appellate Division affirmed, stating that the implied covenant "cannot be construed so broadly as effectively to nullify other express terms of a contract or to create independent contractual rights." *Fesseha v. TD Waterhouse Investor Servs., Inc.*, 761 N.Y.S.2d at 23.

LJM's allegations similarly do not state a claim. The Clearing Agreement and regulatory scheme authorize WFS to terminate the Agreement and force a liquidation (see pp. 7-10, 13, *supra*), and "[a]s to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct." *VTR, Inc. v. Goodyear Tire & Rubber Co.*, 303 F. Supp. 773, 778 (S.D.N.Y. 1969); *see LJL 33rd Street Assocs., LLC v. Pitcairn Props. Inc.*, 725 F.3d 184, 195 (2d Cir. 2013) ("[T]he implied covenant of good faith cannot create duties that negate explicit rights under a contract."). Moreover, liquidation was eminently reasonable in light of LJM's already staggering losses (Counterclaim ¶¶ 2, 16, 29), and WFS was not "not required . . . to choose the most beneficial trading strategy for [LJM]." *Peak Ridge*, 930 F. Supp. 2d at 541. Finally, because "the right to liquidate is for the benefit of [WFS] in protecting itself against high-risk positions" (*id.*), it was entirely appropriate, not arbitrary and capricious, for WFS to act to protect its, the CME's, and the market's interests. *Fesseha*, 747 N.Y.S.2d at 680.

Accordingly, LJM's implied covenant count does not state a claim and should be dismissed.

### C.   The Breach of Fiduciary Duty Counterclaim Should be Dismissed Because it is Barred by the Agreement and Conflicts With Governing Law.

Count III of LJM's complaint asserts that WFS's alleged forced liquidation of LJM's accounts violated WFS's fiduciary duty because "Wells put its own interests ahead of the interests of its principal" and "ordered that the liquidation be conducted in a means and manner inconsistent with its fiduciary duty of care." Counterclaim ¶¶ 59-60. This count does not state a claim.

First, the Clearing Agreement repeatedly provides that WFS "is not acting as a fiduciary . . . with respect to [LJM] or any Account" and is "not . . . responsible for compliance with any law or regulation governing the conduct of fiduciaries." Clearing Agt. ¶¶ 2, 4(a).

LJM acknowledges these provisions, but asserts that "the disclaimer of fiduciary duties" does not survive termination of the Clearing Agreement. Counterclaims ¶ 57. This argument is frivolous. In the first place, as explained above (pp. 10, 14-15, *supra*), delivery of the notices of termination did *not* terminate the Clearing Agreement. The Clearing Agreement provides that (1) "[i]n the event of a notice terminating this Agreement, [LJM] shall either close out open positions in the Account or arrange for such open positions to be transferred to another FCM promptly," and (2) the Agreement does not actually terminate until all open positions have been "closed" or "transfer[red] to another FCM" and all of LJM's "liabilities to [WFS]" have been satisfied. Clearing Agt. ¶ 24 ("[W]hereupon this Agreement shall terminate"). Thus, the Agreement remained in effect until after the accounts were liquidated.

Moreover, it is pure sophistry to assert that WFS's obligations as clearing FCM somehow increase after an agreement is terminated. To the contrary, the Agreement expressly provides that "[t]ermination shall not relieve either party of any . . . liability or obligation incurred prior to such termination." *Id*. Thus, contrary to LJM's assertion, the disclaimer of fiduciary liability remains in force.

Quite apart from the contractual disclaimer, LJM's assertion that WFS violated its fiduciary duties by "put[ting] its own interests ahead of the interests of [LJM]" (Counterclaim ¶ 59) is wholly incompatible with the regulatory scheme. Indeed, the Agreement provides that WFS has no fiduciary duties to LJM because as a clearing FCM and guarantor, its duties are to

22

the CME, not LJM.[13] Contrary to LJM's assertions that WFS breached its fiduciary duty by forcing liquidation of LJM's accounts, therefore, forcing the liquidation of risky accounts is precisely what WFS should do under the Clearing Agreement and the regulatory scheme. *See* pp. 7, 10, 16, 18, *supra*. Thus, as *First American* held, "liquidation of defendants' account . . . did not constitute a breach of fiduciary duty, particularly since the upholding of any such duty would necessarily be contrary to the federal regulatory scheme, as well as to the liquidation provision of the Customer Agreement." 756 N.E.25 at 285. LJM's breach of fiduciary duty counterclaim should be dismissed.

### D.    The Negligence Counterclaim Should be Dismissed Because it is Barred by the Clearing Agreement and Fails as a Matter of Law.

LJM's final count is a "Negligence" claim alleging that WFS liquidated LJM's accounts in a "manner inconsistent with its duty of care." Counterclaim ¶ 65. This count too should be dismissed as a matter of law.

First, the Clearing Agreement disclaims liability for ordinary negligence, providing that WFS is *not* "responsible for any loss, liability, damage or expense except to the extent that such loss, liability, damage or expense arises from its *gross negligence or willful misconduct*." Clearing Agt. ¶ 22 (emphasis added). Such provisions "are valid and enforceable under New York law," *Peak Ridge*, 930 F. Supp. 2d at 544, and for the reasons already discussed, the Clearing Agreement was in force during the events underlying the Counterclaim. Accordingly, LJM's negligence count is barred by contract and should be dismissed.

---

[13]    Quite apart from the contractual disclaimer of fiduciary duties, under New York law, an FCM without discretionary authority like WFS has no fiduciary duties to customers aside from the "activities described in 17 C.F.R. § 1.3(p) (1982)—taking orders, executing trades, dealing with customer funds." *Sherman v. Sokoloff*, 570 F. Supp. 1266, 1269 n.10 (S.D.N.Y. 1983). LJM's breach of fiduciary duty allegations do not involve these activities, another reason this count of the counterclaim does not state a valid claim.

23

LJM's negligence count also fails because LJM does not allege that WFS owed it any "legal duty independent of the contract itself." *Negrete*, 187 F. Supp. 3d at 471 (quotation omitted). The duty LJM identifies is the same one underlying its contract claim—that WFS should not have directed LJM to liquidate its portfolio in the manner it did. Counterclaim ¶ 65. Because LJM's Counterclaim does not allege WFS had an "independent legal duty" that "'spring[s] from circumstances extraneous to' the contract," it does not state a negligence claim. *Negrete*, 187 F. Supp. 3d at 471 (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 194 (N.Y. 1987)). Consequently, LJM's "negligence" count should be dismissed.

> **E.    The Clearing Agreement Bars LJM's Request for Punitive Damages.**

The Court should dismiss LJM's request for punitive damages (Counterclaim ¶¶ 61, 66) because the Clearing Agreement expressly bars "consequential, incidental, special or punitive damages." Clearing Agt. ¶ 22. This provision is enforceable under New York law, *Peak Ridge*, 930 F. Supp. 2d at 544, and courts in this District have dismissed punitive-damages requests based on such contractual waivers. *E.g.*, *Merryman v. J.P. Morgan Chase Bank, N.A.*, 2016 WL 5477776, at *13 (S.D.N.Y. Sept. 29, 2016) (dismissing punitive-damages request because parties' contracts "include[d] punitive damages waivers").

> **CONCLUSION**

For these reasons, the Court should dismiss LJM's Counterclaim with prejudice.

Dated: June 15, 2018                    Respectfully submitted,

**WELLS FARGO SECURITIES, LLC**

By: _/s/Howard J. Roin_
    One of its attorneys

Howard J. Roin*
Thomas S. Kiriakos*
Peter B. Baumhart*
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL  60606
(312) 782-0600
hroin@mayerbrown.com
tkiriakos@mayerbrown.com
pbaumhart@mayerbrown.com
*admitted _pro hac vice_

Nina N. Shah
MAYER BROWN LLP
1221 6th Avenue
New York, NY  10020
(212) 506-2500
nnshah@mayerbrown.com

_Attorneys for Plaintiff_

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that he caused a true and correct copy of the foregoing to be served on Defendants via the Court's electronic filing system on June 15, 2018.

/s/ Peter B. Baumhart
Peter B. Baumhart