USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
                                                :

WELLS FARGO SECURITIES, LLC,            :

                    Plaintiff,          :

                      -v-                :           18-cv-2020 (KBF)

LJM INVESTMENT FUND, L.P. and LJM     :           MEMORANDUM
PARTNERS, LTD,                       :           OPINION & ORDER

                    Defendants.       :

LJM INVESTMENT FUND, L.P., LJM MASTER  :
TRADING FUND, L.P., LJM OFFSHORE FUND, :
LTD, and PFC-LJM PRESERVATION AND     :
GROWTH FUND, L.P.,                 :

                    Counterclaimants,   :

                      -v-                :

WELLS FARGO SECURITIES, LLC,            :

                    Counter-defendant.  :
------------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

      Before the Court are straightforward breach of contract claims arising out of

a Futures and Cleared Swaps Agreement (the "Agreement").  The Agreement,

executed by Plaintiff Wells Fargo Securities, LLC ("WFS") and Defendant LJM

Investment Fund, L.P. ("LJM"), governs the clearing and execution services that

WFS provided to LJM in connection with LJM's activity on the Chicago Mercantile

Exchange (the "Exchange").

WFS filed its complaint with this Court on March 6, 2018, seeking

approximately $16 million in contract damages for LJM's failure to reimburse WFS

for losses incurred on the Exchange.  (Complaint ¶¶ 25-30.)  LJM and several

affiliates (collectively, "LJM") bring counterclaims for breach of contract (Count I),

breach of implied covenant of good faith and fair dealing (Count II), breach of

fiduciary duty (Count III), and negligence (Count IV), alleging that after LJM

suffered significant unrealized losses, WFS impermissibly ordered LJM to liquidate

its open positions through a series of specific transactions—actions that, according

to LJM, compounded anticipated losses.  (Id. ¶¶ 22, 23.)

WFS now moves to dismiss LJM's counterclaims.  Notwithstanding LJM's

claims in tort and its emphasis on the events of trading on February 5 and February

6, this case may be resolved by applying straightforward contract principles to a

clear and unambiguous Agreement.  This Court has diversity jurisdiction pursuant

to 28 U.S.C. § 1332(a)(1).  For the reasons set forth below, WFS' motion to dismiss is

GRANTED and Counts I through IV of LJM's counterclaims are dismissed with

prejudice.

I.      FACTUAL BACKGROUND

        A.      The Agreement

On February 26, 2015, WFS entered into an Agreement with LJM whereby

WFS, acting as a futures commission merchant ("FCM"), provided certain clearing

and execution services to LJM, which traded options contracts ("Derivatives") on the

Exchange.  (Countercl. ¶ 1; Agmt. ¶ 1.)  The Agreement, which includes an

Amendment executed June 2, 2015,[1] authorizes WFS to execute Derivatives trades

"for the account and risk of [LJM]." (Agmt. § 2.) The Agreement provides that

"WFS is acting as agent and not principle in the execution and/or clearing of

Derivatives," and that "WFS is not acting as a fiduciary or advisor with respect to

[LJM] or any Account." (Id.) The Agreement and Amendment stipulate that they

contain "the entire agreement between the parties," and certify that they have been

executed by authorized representatives of WFS and LJM. (Agmt. § 33; June 2

Amend. § 10.)

In connection with WFS' role as an FCM, the Agreement requires LJM to

maintain sufficient cash and other liquid assets ("Margin") as bond to insure its

trades on the Exchange. (Id. § 10.) WFS may demand Margin payments from LJM

at any time, and LJM must make payment within the deadlines set forth in Section

10. (See id.)

To guarantee payment of Margin, Section 13 of the Agreement grants WFS

security interests in certain of LJM's assets, including Derivatives traded on the

Exchange (collectively, "Collateral"). (Id. § 13.) With respect to such Collateral,

LJM has also agreed to the following terms:

> (d) [LJM] agrees that it will promptly execute and deliver
> to WFS all documents and instruments, and take such
> further actions, reasonably requested by WFS from time
> to time to protect, preserve and perfect WFS' rights and
> interests in the Collateral. . . .

---

[1] Unless otherwise specified, references and citations to the "Agreement" are to the final form of the
Agreement, which incorporates the June 2 Amendment.

(e) Subject to any requirements under Applicable Law, [LJM] hereby grants Wells Fargo the right to borrow, pledge, repledge, hypothecate, rehypothecate, loan or invest any of the Collateral, including investing such Collateral in any instrument authorized under Applicable Law, in each case without notice to [LJM], and without any obligation to pay or to account to [LJM] for any interest, income or benefit that may be derived therefrom.

(Id. § 13(a),(d)-(e).)

In addition, the Agreement includes a detailed description of events which would constitute "default" by LJM. Under Sections 18 and 19, an "event of default," such as "fail[ure] to deposit or maintain required Margin," would grant WFS the right to "close out, liquidate, terminate or net at such times as WFS deems appropriate, any or all open Derivatives and other positions (including Collateral) in [LJM's] Account." (Agmt. §§ 18(a), 19(b).)

Finally, the Agreement sets forth the terms by which the WFS or LJM may terminate the parties' business relationship. According to Section 24, the "Agreement may be terminated at any time by [LJM] or WFS by written notice to the other." (Id. § 24.) Termination, however, "shall not relieve either party of any obligations in connection with any debit or credit balance or other liability or obligation incurred prior to such termination," and does not take effect until such liabilities are satisfied. (Id.)

B.    The Events of February 5 and February 6

Two years after executing the Agreement, on February 5, 2018, the options market on the Exchange experienced extreme and unusual instability—a "black swan" event which commentators have referred to as "Volatility Black Monday" or

4

"Vol-mageddon." (Countercl. ¶ 15.) LJM's portfolio, which was guaranteed by WFS, suffered significant losses. (Id. ¶ 19.) That evening, WFS sent LJM a position statement and demand for "exorbitantly high margin deposits." (Id. ¶ 21.) According to LJM, WFS issued this demand even though it knew its analysis of LJM's portfolio was based on incomplete and incorrect information. (Id. ¶ 21.) LJM does not allege that it submitted payment according to WFS' demand.

On the morning of February 6, WFS sent a letter terminating the Agreement as of right and directing LJM to "promptly close out or transfer any open positions in the account." (Koral Decl. Ex. A.) WFS further directed LJM to liquidate its open positions with an immediate before-market sale of E-mini S&P 500 futures ("E-mini futures"), which LJM alleges it "never would have sold" under the circumstances. (Countercls. ¶ 23-24.) To ensure LJM's compliance, WFS sent two employees to LJM's offices to monitor and report on LJM's activities. (Id. ¶ 25.) By the end of the trading day, per WFS' instruction, LJM had completely unwound its portfolio, losing more than $266 million across all managed and affiliated funds. (Id. ¶ 29.) LJM alleges that these losses were approximately $115 million more than what LJM would have suffered had it applied its trading procedures rather than liquidate the Account. (Id. ¶ 29.)

## II.   LEGAL PRINCIPLES

### A.   Standard of Review

A claim is subject to dismissal under Federal Rule of Civil Procedure 12(b)(6) where it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a claimant must provide

grounds upon which their claim rests through "factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In applying this standard, the Court accepts as true all well-pled factual allegations, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." Id. The Court will give "no effect to legal conclusions couched as factual allegations." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir.2007) (citing Twombly, 550 U.S. at 555). Here, the Court accepts the factual allegations in LJM's counterclaims as true, but refers to the Agreement itself to the extent LJM's counterclaims rely upon its terms and effect. See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 ("Although the amended complaint in this case does not incorporate the Agreement, it relies heavily upon its terms and effect; therefore, the Agreement is 'integral' to the complaint, and we consider its terms . . . .").[2]

---

[2] The parties do not dispute the validity of the Agreement provided to the Court. Moreover, LJM has directed the Court to consider the Agreement itself when reviewing WFS' complaint. (See Answer ¶ 9 ("LJM . . . respectfully refers the Court to [the Agreement] for the complete and accurate statement of its contents."))

B.      Breach of Contract

To succeed on a claim for breach of contract, a plaintiff must demonstrate "(1)

the existence of an agreement, (2) adequate performance of the contract by the

plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Glob.

Master Fund Ltd. v. Morgan Guar. Tr. Co., 375 F.3d 168, 177 (2d Cir. 2004)

(quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)).

Under New York law, "when the terms of a written contract are clear and

unambiguous, the intent of the parties must be found within the four corners of the

contract." In re Matco-Norca, Inc., 22 A.D.3d 495, 496 (N.Y App. Div. 2005)

(citations omitted).  "Further, a court may not write into a contract conditions the

parties did not insert by adding or excising terms under the guise of construction,

nor may it construe the language in such a way as would distort the contract's

apparent meaning."  Id. (citations omitted).[3]

---

[3] The Court dismisses LJM's claims for breach of implied covenant of good faith and fair dealing (Count II), breach of fiduciary duty (Count III), and negligence (Count VI), as they duplicate LJM's claims for breach of contract.  See In re Refco Inc. Sec. Litig., 826 F. Supp. 2d 478, 496 (S.D.N.Y. 2011) ("Under New York law, a claim for breach of the implied covenant can survive a motion to dismiss only 'if it is based on allegations different than those underlying the accompanying breach of contract claim' and if the relief sought is not 'intrinsically tied to the damages allegedly resulting from the breach of contract.'" (quoting ARI and Co., Inc. v. Regent Int'l Corp., 273 F. Supp. 2d 518, 521-22 (S.D.N.Y. 2003))); Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193-94 ("[A] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.").  Moreover, with respect to Count III, "parties to a commercial contract do not ordinarily bear a fiduciary relationship to one another unless they specifically so agree." Calvin Klein Trademark Trust v. Wachner, 123 F. Supp. 2d 731, 733-34 (S.D.N.Y. 2000). Here, nothing in the Agreement suggests that the parties intended to create a fiduciary relationship. By contrast, Sections 2 and 4 expressly disclaim any fiduciary responsibilities.  (See Agreement § 2 ("[LJM] acknowledges . . . that WFS is acting as agent and not principal in the execution and/or clearing of Derivatives and WFS is not acting as a fiduciary or advisor with respect to [LJM] or any Account."); id. § 4 ("WFS is not acting . . . as a fiduciary."))  The Court has no basis to ignore these provisions, especially in light of New York courts' unwillingness to fashion additional obligations on top of ordinary commercial contracts.  See Krys v. Butt, 486 Fed. Appx. 153, 155 (2d Cir. 2012) ("If the parties do not create their own relationship of higher trust, courts should not ordinarily

III.    DISCUSSION

LJM's breach of contract claims cannot survive scrutiny, as the Agreement

provides broad authority for WFS to terminate the Agreement and direct LJM to

liquidate its open positions—even through specific trades, such as those complained

of in this case.

As an initial matter, when WFS sent written notice terminating its business

relationship with LJM, Section 24 of the Agreement entitled WFS to insist that

LJM either "close out open positions in the Account or arrange for such open

positions to be transferred to another FCM promptly." (Agmt. § 24.)  LJM

acknowledges this, (Countercl. ¶ 40), and does not allege that it took any action to

transfer its open positions to another FCM.  Nonetheless, LJM suggests that it

maintained some right *not* to promptly close its open positions.  (See, e.g.,

Countercl. ¶ 28 ("If LJM had not liquidated, but simply maintained the positions it

had on the morning of February 6 . . . ."); id. ¶ 43 ("The [WFS] liquidation and

trades resulted in losses far greater than would have occurred had [LJM] been

permitted to manage their portfolio as set forth in the Agreements.").)  But LJM

points to no terms in the Agreement (and the Court finds none based on its own

examination) that would grant LJM a right to delay closure of its Account.  Without

some contractual hook—and in light of the plain language of Section 24 requiring

LJM to either close out or transfer its open positions promptly—LJM cannot state a

claim for breach of contract.  Instead, LJM's allegations indicate that, at most, WFS

---

transport them to the higher realm of relationship and fashion the stricter duty for them." (quoting
EBC I, Inc. v. Goldman, Sachs & Co., 832 N.E.2d 26, 31 (N.Y. 2005)).

took action to ensure LJM complied with the termination procedures set forth under Section 24.  See Rex Med. L.P. v. Angiotech Pharms. (US), Inc., 754 F. Supp. 2d 616, 627 ("[B]eing forced to comply with contractual obligations that a party voluntarily entered into is simply not the sort of 'damage' that is compensable at law.").

Even if Section 24 entitled LJM to delay closing its Account, WFS maintained other rights that allowed it to act as it did.  Under Section 24, a notice of termination "shall not relieve either party of any obligations . . . incurred prior to such termination."  (Agmt. § 24.)  Moreover, although WFS' notice of termination required LJM to promptly "close out" or "transfer[]" its open positions, the Agreement itself does not terminate immediately, but "[u]pon satisfaction of all of [LJM's] liabilities to Wells Fargo."  (Id.)  Therefore, WFS' rights did not terminate until LJM satisfied its obligations to meet WFS' demand for Margin on February 5, 2018.  (See Countercl. ¶ 21.).  While the agreement remained in effect, Section 13 provided ample authority for WFS to direct the sale of the E-mini futures.

Section 13 granted WFS a security interest in all of LJM's Derivatives, including "futures contracts and options on futures contracts" such as the E-mini futures, in order "to secure any deficit, indebtedness or other amounts, obligations and/or liabilities at any time owed to Wells Fargo."  (Agmt. §13; id. ¶ 1.)  Further, LJM granted WFS broad rights to protect its interests in this Collateral.  Under subsection (d), for example, LJM agreed to "promptly execute and deliver to WFS all documents and instruments, and take such further actions, reasonably requested by WFS from time to time to protect, preserve and perfect WFS' rights and interests in

9

the Collateral." (<u>Id.</u> § 13(d).)  And under subsection (e), LJM granted WFS the right

to "loan or invest any of the Collateral, including investing such Collateral in any

instrument authorized under Applicable Law, in each case without notice to [LJM],

and without any obligation to pay or to account to [LJM] for any interest, income or

benefit that may be derived therefrom."  (<u>Id.</u> §13(e).)

These terms evidence LJM's clear intent to grant WFS broad authority to

take unilateral action with respect to its Collateral—up to and including

"instruct[ing] LJM to conduct an immediate bulk sale of E-mini S&P 500 futures."

(Countercl. ¶ 23.)  Given the "extreme and unusual instability" in the options

markets "result[ing] in mark-to-market losses on LJM's open options positions,"

(Countercls. ¶¶ 15-16), the Court will not second-guess the reasonableness of WFS'

instruction.  (<u>See</u> Agmt. § 13(d) (authorizing WFS to "take such further actions,

*reasonably* requested by WFS from time to time to protect, preserve and perfect

WFS' rights and interests in the Collateral." (emphasis added)); <u>Morgan Stanley &</u>

<u>Co. Inc. v. Peak Ridge Msater SPC Ltd.</u>, 930 F. Supp. 2d 532, 541 ("'We are not

equipped to second-guess, especially with the benefit of hindsight, the business

judgments of professional traders regarding the risks associated with any given

position or the volatility and direction of any future market movements.'" (quoting

<u>Capital Options Invs., Inc. v. Goldberg Bros. Commodities, Inc.</u>, 1990 WL 180583, at

*6 (N.D. Ill. Nov. 5, 1990))).  Even if WFS' sale of the E-mini futures was objectively

unreasonable here, subsection (e) expressly authorizes WFS to invest LJM's

Derivatives as it sees fit.  (<u>See</u> Agmt. §13(e).)  By its terms, the Agreement allows

WFS to direct and execute specific transactions, including the sale of the E-mini

futures. The right to take such action does not turn on an "event of default" and

does not, in any case, require notice to LJM.[4] (Id.)

IV.    CONCLUSION

For the reasons set forth above, LJM's counterclaims are dismissed with

prejudice.

The Clerk of the Court is directed to terminate the motion at ECF No. 36.

SO ORDERED.

Dated:        New York, New York
              September 11, 2018

_____
                        KATHERINE B. FORREST
                        United States District Judge

---

[4] For the purposes of this motion, the Court accepts as true LJM's assertion that no event of default had occurred at the time WFS directed the liquidation of LJM's Account. (LJM Resp. Br. at 1.) If, however, discovery were to reveal that LJM in fact "fail[ed] to maintain required Margin" or breached other obligations described in the Agreement, Sections 18 and 19 grant WFS the right to "close out, liquidate, terminate or net at such time as WFS deems appropriate, any or all open Derivatives and other positions (including Collateral) in [LJM's] Account." (Agmt. § 19(b).)