UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

WELLS FARGO SECURITIES, LLC,

       Plaintiff,

  -v-                                                        No. 18 CV 2020-LTS-SLC

LJM INVESTMENT FUND, L.P. and LJM
PARTNERS, LTD.,

       Defendants.

-------------------------------------------------------x

LJM INVESTMENT FUND, L.P., LJM
MASTER TRADING FUND, L.P., LJM
OFFSHORE FUND, LTD., AND PFC-LJM
PRESERVATION AND GROWTH FUND,
L.P.,

       Counterclaimants,

  -v-

WELLS FARGO SECURITIES, LLC,

       Counter-defendant.

-------------------------------------------------------x

MEMORANDUM OPINION AND ORDER

       Plaintiff Wells Fargo Securities, LLC ("WFS") brings this action for breach of contract against Defendants LJM Investment Fund, L.P. and LJM Partners, Ltd. Now before the Court is the motion filed by counterclaimants LJM Investment Fund, L.P. and its affiliates LJM Master Trading Fund, L.P., LJM Offshore Fund, Ltd., and PFC-LJM Preservation and Growth Fund, L.P. (collectively, "LJM") (docket entry no. 73), seeking leave to replead LJM's counterclaim for breach of contract, which the Court dismissed on September 11, 2018, and, on

reconsideration, permitted LJM to file a motion for leave to replead.  See Wells Fargo Sec., LLC v. LJM Inv. Fund, L.P., No. 18-CV-2020 (KBF), 2018 WL 4335512 (S.D.N.Y. Sept. 11, 2018) (docket entry no. 47, the "September Opinion"), opinion vacated in part on reconsideration, No. 18-CV-2020 (LTS) (HBP), 2019 WL 3553290 (S.D.N.Y. Aug. 5, 2019) (docket entry no. 64, the "Reconsideration Opinion").  The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332.  The Court has carefully reviewed the parties' submissions and, for the reasons stated below, LJM's motion for leave to replead its counterclaim for breach of contract is granted.

BACKGROUND

The Court assumes the parties' familiarity with the background of this case, which is laid out in greater detail in the September Opinion and the Reconsideration Opinion. The September Opinion summarized the parties' relationship as follows:

> On February 26, 2015, WFS entered into [a Futures and Cleared Swaps] Agreement [(docket entry nos. 1-1 and 1-2, the "Agreement" or "Agmt.")] with LJM whereby WFS, acting as a futures commission merchant ("FCM"), provided certain clearing and execution services to LJM, which traded options contracts ("Derivatives") on the [Chicago Mercantile] Exchange [(the "Exchange")].  ([Agmt. § 1].)  The Agreement, which includes an Amendment executed [on] June 2, 2015,[1] authorizes WFS to execute Derivatives trades "for the account and risk of [LJM]."  (Agmt. § 2.) . . . .
>
> In connection with WFS' role as an FCM, the Agreement requires LJM to maintain sufficient cash and other liquid assets ("Margin") as bond to insure its trades on the Exchange.  (Id. § 10.)  WFS may demand Margin payments from LJM at any time, and LJM must make payment within the [transfer] deadlines set forth in Section 10.  (See id.) . . .
>
> In addition, the Agreement includes a detailed description of events which would constitute "default" by LJM. Under Sections 18 and 19, an "event of default," such as "fail[ure] to deposit or maintain required Margin,"

---

[1]  Unless otherwise specified, references and citations to the "Agreement" are to the final form of the Agreement, which incorporates the June 2 Amendment.

> would grant WFS the right to "close out, liquidate, terminate or net at such times as WFS deems appropriate, any or all open Derivatives and other positions (including Collateral) in [LJM's] Account." (Agmt. §§ 18(a), 19(b).)
>
> Finally, the Agreement sets forth the terms by which [] WFS or LJM may terminate the parties' business relationship. According to Section 24, the "Agreement may be terminated at any time by [LJM] or WFS by written notice to the other." (Id. § 24.) . . .

(September Opinion at 2-4.) The Agreement's termination clause also provided that "[i]n the event of a notice terminating this Agreement, [LJM] shall either close out open positions in the Account or arrange for such open positions to be transferred to another FCM promptly." (Agmt. § 24.)

WFS's Complaint (docket entry no. 1, "Compl.") alleged that, after LJM's account suffered heavy losses in early February 2018, LJM breached the parties' Agreement by failing to reimburse WFS the more than $16 million that WFS had to pay the Exchange on behalf of LJM. (Id. ¶¶ 7-10, 16-24.)

LJM counterclaimed, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and negligence. (docket entry no. 26 ("Countercl.").) As summarized in the September Opinion, LJM alleged that:

> Two years after [the parties executed] the Agreement, on February 5, 2018, the options market on the Exchange experienced extreme and unusual instability—a "black swan" event which commentators have referred to as "Volatility Black Monday" or "Vol-mageddon." (Countercl. ¶ 15.) LJM's portfolio, which was guaranteed by WFS, suffered significant losses. (Id. ¶ 19.) That evening, WFS sent LJM a position statement and [a] demand for "exorbitantly high margin deposits." (Id. ¶ 21.) According to LJM, WFS issued this demand even though it knew its analysis of LJM's portfolio was based on incomplete and incorrect information. (Id. ¶ 21.) LJM does not allege that it submitted payment according to WFS' demand.
>
> On the morning of February 6, WFS sent a letter terminating the Agreement as of right and directing LJM to "promptly close out or transfer

> any open positions in the account." ([docket entry no. 45-1,] Koral Decl. Ex. A.) WFS further directed LJM to liquidate its open positions with an immediate before-market sale of E-mini S&P 500 futures ("E-mini futures"), which LJM alleges it "never would have sold" under the circumstances. (Countercl. ¶ 23-24.) To ensure LJM's compliance, WFS sent two employees to LJM's offices to monitor and report on LJM's activities. (Id. ¶ 25.) By the end of the trading day, per WFS' instruction, LJM had completely unwound its portfolio, losing more than $266 million across all managed and affiliated funds.

(September Opinion at 2-5.) LJM alleged that, "[u]nder the termination clause, [LJM was] entitled either to 'close out open positions in the Account' or to 'arrange for such open positions to be transferred to another FCM,'" but that, "instead of permitting [LJM] to manage [its] own book," WFS "recklessly coerced [LJM] into liquidating [its] portfolios in a commercially unreasonable manner." (Countercl. ¶¶ 40-41.)

WFS moved to dismiss LJM's counterclaims for failure to state a claim. In the September Opinion, United States District Judge Katherine B. Forrest granted that motion and dismissed LJM's counterclaims with prejudice, as explained in the Reconsideration Opinion:

> In the September Opinion, Judge Forrest concluded that Section 24 of the Agreement entitled WFS to insist that LJM either "close out open positions in the Account or arrange for such open positions to be transferred to another FCM promptly." (Id. at 8.) To the extent that LJM argued that WFS breached the Agreement by not permitting LJM an opportunity to apply its own trading procedures or otherwise not promptly close its open positions, Judge Forrest found that there were no terms in the Agreement that granted LJM that right. (Id.) Even if LJM had some right to delay closing its accounts under the Agreement, Judge Forrest concluded, Sections 13(d) and 13(e) of the Agreement "provided ample authority for WFS to direct the sale of the E-mini futures" and "grant[ed] WFS broad authority to take unilateral action with respect to its Collateral—up to and including 'instructing LJM to conduct an immediate bulk sale of E-mini S&P 500 futures.'" (Id. at 9-10.) To the extent that Section 13(d) only authorized WFS to take actions "reasonably requested . . . to protect, preserve, and perfect WFS's rights and interest in the Collateral," Judge Forrest determined that, "given the 'extreme and unusual instability' in the options markets," the Court would not "second-guess the reasonableness of WFS' instruction." (Id. at 10.) And, even if WFS' sale of E-mini futures was objectively unreasonable, Judge Forrest

> found, Section 13(e) "expressly authorizes WFS to invest LJM's Derivatives as it sees fit." (Id.)

(Reconsideration Opinion at 4-5.)

LJM moved for reconsideration of the September Opinion. The Court granted that motion in part as to the dismissal of LJM's counterclaim for breach of contract, concluding principally that the September Opinion's sua sponte reliance on Section 13 of the Agreement was improper, because "Section 13 does not, on its face, authorize WFS to direct the liquidation of LJM's portfolio." (Reconsideration Opinion at 7.)[2] Regarding the September Opinion's reliance on the Agreement's termination clause, the Court wrote:

> LJM contends that the September Opinion erroneously concluded that LJM had no right to delay closing its accounts under the Agreement, when in fact LJM had a right under Section 24 of the Agreement to either transfer or close out its open positions "promptly." While the September Opinion correctly concluded that Section 24 allows LJM to "either close out open positions in the Account or arrange for such open positions to be transferred to another FCM promptly," LJM's counterclaim does not plead plausibly that that LJM intended, on the morning of February 6, 2018, to promptly close out or transfer its open positions. The counterclaim alleges that WFS breached the Agreement by not "allowing LJM time to execute its well-conceived plan to contain its temporary paper losses until the market normalized" (Countercl. ¶ 2), not allowing LJM to "carr[y] out its well-practiced risk containment procedures" (id. ¶ 28), and not "permit[ting] [LJM] to manage their own book" (id. ¶ 41). These allegations are insufficient under Twombly to raise a plausible inference that LJM sought to close out open positions in the Account, or to arrange for those positions to be transferred promptly to another FCM, on February 6, 2018. However, because the arguments raised by LJM, if supported by proper factual allegations, may be sufficient to state a claim for breach of contract, and in light of the principles articulated by the Second Circuit in Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs. LLC, 797 F.3d 160 (2d Cir. 2015), the Court grants LJM leave to replead its counterclaim for breach of contract. Accordingly, the Court vacates the September Opinion insofar as it dismisses LJM's breach of

---

[2] LJM also sought reconsideration of Judge Forrest's dismissal of LJM's other counterclaims (for breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and negligence). The Court denied reconsideration as to those counterclaims, which are not at issue on this motion.

>contract counterclaim with prejudice and LJM may seek leave to replead
>that counterclaim.

(Reconsideration Opinion at 9.)

In response to the Reconsideration Decision, LJM filed the instant motion seeking leave to file an amended counterclaim for breach of contract.  In its proposed amended pleading, LJM alleges that (1) it had a history of and experience in exiting positions during high volatility events (docket entry no. 68-1 ("Am. Countercl.") ¶¶ 3, 20, 23-25, 46), and (2) after receiving WFS's notice of termination on the morning of February 6, it intended to "clos[e] out certain open positions in an orderly manner throughout the trading day while also requesting that one or more of its other FCMs take other portions of the account."  (Id. ¶¶ 3, 41, 53, 65-66.) Specifically, LJM's amended pleading alleges that:

>LJM planned to carry out its tested liquidation and risk management
>procedures to wind down the portfolio in a steady and orderly fashion, or
>else to transfer some or all of the positions to another, more reasonable
>FCM.  Had LJM been given sufficient time, it could have sought to
>transfer its position to one of its other brokers.  Alternatively, left to its
>proper devices, as required under the contract, LJM could have conducted
>an orderly exit from its options positions by the end of the trading day[.]

(Id. ¶ 41.)  LJM also alleges that at the time WFS terminated the parties' Agreement and demanded that LJM liquidate its account (i.e., the morning of February 6), the margin deposits demanded by WFS "were not due" under the terms of the Agreement, and LJM "was still in full compliance with its obligations under the Agreement[.]"  (Id. ¶ 38.)

## DISCUSSION

Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend pleadings "should [be] freely give[n] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Leave to amend may, however, be denied if the amendment (1) has been delayed unduly, (2) is sought for

dilatory purposes or is made in bad faith, (3) would unduly prejudice the opposing party, or (4) would be futile.  Kim v. Kimm, 884 F.3d 98, 105 (2d Cir. 2018).  A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  Ballard v. Parkstone Energy, LLC, No. 06-CV-13099 (RWS), 2008 WL 4298572, at *3 (S.D.N.Y. Sept. 19, 2008).

Under the Rule 12(b)(6) standard, the Court accepts as true the non-conclusory factual allegations in the pleading and draws all reasonable inferences in the pleader's favor.  Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007).  To survive a motion to dismiss, a pleading must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007).  However, a "pleading that offers labels and conclusions or a formulaic recitation of elements of a cause of action will not do."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).  To state a claim upon which relief can be granted, its factual allegations "must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.

Bad Faith

WFS first argues that the Court should deny LJM's motion because it is made in bad faith.  According to WFS, LJM's bad faith is evidenced by (1) inconsistencies between LJM's proposed pleading and two letters dated February 6 and 8, 2018, from LJM's founder and chairman Tony Caine to LJM's clients, describing the events of February 5 and 6, 2018, and (2) inconsistencies between LJM's proposed pleading and its prior pleadings and arguments in this action.

At the pleadings stage, the Court declines to consider the substance of Mr. Caine's letters—which are neither attached to nor incorporated into the pleadings—in connection

with its bad faith analysis.  To be sure, as WFS notes, at least one court in this Circuit has relied on materials outside the pleadings in denying a motion for leave to amend at the motion to dismiss stage.  See Johnson v. The Univ. of Rochester Med. Ctr., 686 F. Supp. 2d 259, 270-71 (W.D.N.Y. 2010) (denying leave to amend on both bad faith and futility grounds where the plaintiff sought to sue a physician for libel based on the physician's publication of a document which the physician had published at the request of (and with the authorization of) plaintiff and plaintiff's own counsel).[3]  The Second Circuit has not explicitly addressed whether such reliance is appropriate.  See Gabayzadeh v. Brafman, 502 F. App'x 83, 84 (2d Cir. 2012) (declining to consider whether reliance on materials outside the pleadings in determining bad faith on a motion to amend at the pleadings stage "comport[s] with the notice requirements of our precedents").  In any event, such reliance would be improper at this stage in this case, since the materials proffered by WFS go less to the question of bad faith and more to the question of futility, an analysis where the Court is not free to consider materials outside the pleadings.  See, e.g., Journal Pub. Co. v. Am. Home Assur. Co., 771 F. Supp. 632, 635 (S.D.N.Y. 1991) ("Defendants' contention that the proposed amendments are futile is based largely on factual arguments going to the merits of plaintiffs' claims.  However . . . it is axiomatic that a court may not look beyond the face of the complaint on a motion to dismiss for failure to state a claim.").

The alleged inconsistencies between LJM's prior pleading and briefs and its now-proposed pleading (see docket entry no. 77 ("Opp.") at 7-11), likewise do not compel a finding

---

[3] WFS also relies on Lee v. Regal Cruises, Ltd., 116 F.3d 465, 1997 WL 311780 (2d Cir. 1997) (unpublished table decision), in which the Second Circuit concluded that the district court did not abuse its discretion in denying plaintiff's motion for leave to amend based, in part, on plaintiff's bad faith.  However, the district court's bad faith determination was made at the summary judgment stage, and was based on a more fulsome record (including not only plaintiff's letter, but also her deposition testimony) than the one presently before this Court.

of bad faith. As WFS correctly notes, "a court may consider direct contradictions between earlier pleadings and a proposed amended pleading in determining whether to grant leave to amend, particularly when the proposed amendments concern facts clearly within the plaintiff's knowledge when previous complaints were filed." MacGregor v. Milost Glob., Inc., No. 17-CV-6691 (LTS) (KHP), 2019 WL 2453340, at *6 (S.D.N.Y. Apr. 19, 2019), report and recommendation adopted, 2019 WL 2723522 (S.D.N.Y. July 1, 2019). In this case, however, LJM's new allegations supplement and clarify, rather than directly contradict, its prior allegations. For instance, LJM's initial pleading focused on WFS's alleged interference with LJM's rights to carry out its "well-practiced risk containment procedures" and to "manage [its] own book" in response to the market volatility of February 5 and 6, 2018. (Countercl. ¶¶ 28, 41.) In its proposed amended counterclaim, LJM alleges that it should have been permitted to "carry out its own portfolio wind down procedures, with the intent of closing out or transferring it[s] positions in an orderly fashion," and to "manage the liquidation of [its] own book." (Am. Countercl. ¶¶ 53, 66 (emphasis added).) Even in its original counterclaims, however, LJM asserted that "[u]nder the termination clause," LJM was "entitled to either 'close out open positions in the Account' or to 'arrange for such open positions to be transferred to another FCM,'" and that WFS's alleged breach "resulted in losses far greater than would have occurred had Counterclaimants been permitted to manage their portfolio as set forth in the Agreements." (Countercl. ¶¶ 40, 43.) The Court therefore concludes that neither this purported inconsistency—nor any of the others raised by WFS—is a "direct contradiction" of the type that have led courts to deny leave to amend on bad faith grounds. Cf. Kant v. Columbia Univ., No. 08-CV-7476 (PGG), 2010 WL 807442, at *7 (S.D.N.Y. Mar. 9, 2010) (denying leave to amend where the plaintiff, "[i]n a clumsy attempt to avoid the statute of frauds," sought leave to file an

amended pleading which stripped allegations concerning a multi-year contract "and substituted a conclusory phrase that the entire process . . . would 'be all completed within one year'").[4]

Futility

WFS next argues that LJM's motion should be denied as futile, for three reasons.

First, WFS argues that, despite LJM's supplemental allegations, LJM's counterclaim still fails to allege plausibly that LJM "sought to close out or transfer open positions immediately," and is "deliberately vague on both when and whether LJM would have closed out positions, and when, whether, and the extent to which it would have transferred them." (Opp. at 13-14.) The Court disagrees. Among other facts, LJM now pleads that (1) it had a history of and experience in exiting positions during high volatility events (Am. Countercl. ¶¶ 3, 20, 23-25, 46), and (2) after receiving WFS's notice of termination on the morning of February 6, it intended to "clos[e] out certain open positions in an orderly manner throughout the trading day while also requesting that one or more of its other FCMs take other portions of the account." (Id. ¶¶ 3, 41, 53, 65-66.)[5] Moreover, LJM again alleges that none of LJM's three other FCMs terminated their FCM agreements with LJM or ordered LJM to liquidate any positions, suggesting at least a possibility that one of them might have accepted a transfer of

---

[4]   The Court also notes that LJM proffered its new allegations in an effort "to raise a plausible inference that LJM sought to close out open positions in the Account, or to arrange for those positions to be transferred promptly to another FCM, on February 6, 2018" (Reconsideration Opinion at 9), which is precisely what the Court's Reconsideration Opinion permitted LJM to do.

[5]   Paragraph 41 of LJM's proposed amended counterclaims states in part that "Had LJM been given sufficient time, it could have sought to transfer its position to one of its other brokers. Alternatively, left to its proper devices, as required under the contract, LJM could have conducted an orderly exit from its options positions by the end of the trading day on September 6." The Court assumes that that LJM intended to refer to February 6, not September 6, 2018.

some of LJM's open positions. (Id. ¶ 40.) LJM's amended allegations therefore "raise a plausible inference that LJM sought to close out open positions in the Account, or to arrange for those positions to be transferred promptly to another FCM, on February 6, 2018." (Reconsideration Opinion at 9.)

Second, WFS argues that the word "promptly" in the Agreement's termination clause—which provides that, "[i]n the event of a notice terminating this Agreement, Customer shall either close out open positions in the Account or arrange for such open positions to be transferred to another FCM promptly" (Agmt. § 24)—in effect means "immediately," and that LJM's claim that it was entitled to any longer period than "immediately" to close out or transfer its open positions therefore fails as a matter of law. (Opp. at 14-15.) The Court cannot reach that conclusion on this motion. While a handful of dictionaries equate the words "promptly" and "immediately" (see Opp. at 13 n.7), others do not. Compare, e.g., Promptly, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/promptly (last visited March 30, 2021) ("quickly, without delay, or at the arranged time") with Immediately, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/immediately (last visited March 30, 2021) ("now or without waiting or thinking"). The same is true in the law, where, at least in some contexts, promptly does not mean immediately. See, e.g., Bryant v. City of New York, 404 F.3d 128, 137 (2d Cir. 2005) (explaining in the context of prompt probable cause determinations after arrest, under the Fourth Amendment, that "[c]learly, 'prompt' does not mean "immediate"); Morgan Guar. Tr. Co. of New York v. Bay View Franchise Mortg. Acceptance Co., No. 00-CV-8613 (SAS), 2002 WL 818082, at *5 (S.D.N.Y. Apr. 30, 2002) (explaining in the context of contractual rescission notifications, under New York law, that promptly "does not mean immediately, but rather within a reasonable time") (citation omitted).

Moreover, as LJM notes (see Reply at 10-11), the Agreement's other uses of the world "promptly" suggest that the parties did not understand it to mean immediately. For example, Section 4(d) provides that LJM must "carefully review all other communications from WFS and shall notify WFS of any error immediately in the case of an oral communication and promptly after receipt in the case of a written communication," suggesting that the parties understood a distinction between the two words. Section 10 requires LJM (in the event an Exchange makes an intraday call on WFS for margin, and WFS makes a corresponding demand on LJM) to deliver margin to WFS "promptly and in no event later than the close of business on such business day," suggesting the possibility that "promptly" might otherwise be construed to extend to a period longer than the close of the same business day. Even Section 24 itself—which contemplates that LJM will promptly transfer open positions to another FCM—involves a process which may not be capable of immediate completion given the involvement of third parties. Therefore, in light of the varied definitions of the word promptly in dictionaries and the law, as well of the several uses of the word in the parties' Agreement, LJM has plausibly pled that WFS's demand that LJM immediately liquidate its open positions on the morning of February 6 breached Section 24 of the Agreement.[6]

Third, WFS argues that, in light of the governing regulatory framework and prior case law, it was entitled to liquidate LJM's account immediately, regardless of the text of the Agreement's termination clause, as a matter of law. (Opp. at 12-13, 15-19.) None of the authorities cited by WFS compels denial of LJM's motion on this basis.

---

[6] LJM also contends that the applicable regulatory scheme defines promptly as two business days. (Reply at 12-13.) In light of the foregoing discussion, the Court need not reach that argument on this motion.

WFS relies most heavily on Rule 930.K of the Chicago Mercantile Exchange (the "CME") ("Rule 930.K"), which provides in relevant part:[7]

> 1. Non-Security Futures and OTC Derivatives
>
> If an account holder fails to comply with a performance bond call within a reasonable time (the clearing member may deem one hour to be a reasonable time), the clearing member may close out the account holder's trades or sufficient contracts thereof to restore the account holder's account to required performance bond status. Clearing members shall maintain full discretion to determine when and under what circumstances positions in any account shall be liquidated.

According to WFS, Rule 930.K "authorizes FCMs to immediately liquidate risky accounts." (Opp. at 12.)  By its own terms, however, the rule authorizes liquidation only when an "account holder fails to comply with a performance bond [i.e., margin] call within a reasonable time," which "the clearing member may," but is not required to, "deem" to be as short as one hour. This discretion appears to leave room for FCMs to enter into contracts—as WFS did here—which set forth specific time periods during which customers must meet margin calls. See also Nanlawala v. Jack Carl Assocs., Inc., 669 F. Supp. 204, 210 (N.D. Ill. 1987) (noting that the CME's rules "establish a reasonableness standard for the time accorded a customer to comply with a margin call"); Cauble v. Mabon Nugent & Co., 594 F. Supp. 985, 990 (S.D.N.Y. 1984) ("Margin call notice requirements may be altered or waived by contract, however, and this is done typically in customer agreements which authorize the broker to liquidate any customer property in its possession to satisfy account deficiencies whenever an account becomes undermargined.").  In this case, LJM alleges that, on the morning of February 6, it was "still in full compliance with its [margin] obligations under the Agreement," because the newly-requested margin deposits to WFS were not due, under the Agreement, until the end of that

---

[7] The parties agree that the Agreement is subject to the rules of the CME.

trading day.  (Am. Countercl. ¶ 38.)  LJM therefore plausibly alleges that it had not "fail[ed] to comply with a performance bond call within a reasonable time," and that Rule 930.K did not apply to permit WFS's forced liquidation of LJM's open positions on the morning of February 6.

Similarly, the cases cited by WFS speak to an FCM's authority to liquidate a customer's account where that account is either undermargined or where an event of default has occurred.  See In re MF Glob. Inc., 531 B.R. 424, 433 (Bankr. S.D.N.Y. 2015); Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd., 930 F. Supp. 2d 532 (S.D.N.Y. 2013); First Am. Disc. Corp. v. Jacobs, 324 Ill. App. 3d 997, 756 N.E.2d 273 (2001); Moss v. J.C. Bradford & Co., 337 N.C. 315, 446 S.E.2d 799 (1994); Mohammed v. Carl, CFTC No. 91-R102, Comm. Fut. L. Rep. ¶ 25,229, 1992 WL 15686 (Jan. 27, 1992); Capital Options Investments, Inc. v. Goldberg Bros. Commodities, No. 88-CV-2073 (JFG), 1990 WL 180583 (N.D. Ill. Nov. 5, 1990), aff'd, 958 F.2d 186 (7th Cir. 1992).[8]  Unlike here, the underlying agreements in each of those cases plainly permitted liquidation under the circumstances presented (and in some cases, under any circumstances at all).  In re MF Glob. Inc., 531 B.R. at 432-33 ("Should we deem it desirable for our protection, or should we feel insecure, or should you be in breach of or violate any of the terms of this Agreement, we are authorized to declare (and without the necessity of a call for additional capital) you in default . . .") (emphasis in original); Peak Ridge, 930 F. Supp. 2d at 537-38 (permitting liquidation upon the occurrence of an event of default); Jacobs, 324 Ill. App. 3d at 1008, 756 N.E.2d at 281 ("In the event I [Jacobs] fail to deposit sufficient funds to pay for any commodities and/or to satisfy any demands for original and/or variation margin, or whenever in your [FADC's] sole and absolute discretion you consider it necessary, you may,

---

[8] WFS does not argue that an "Event of Default" had occurred by the morning of February 6.  (See Agmt. § 18 (defining events which shall be deemed an "Event of Default").)

without prior demand or notice, when and if you deem appropriate, notwithstanding any rule of any exchange, liquidate the positions in my account(s)") (emphasis added); Moss, 337 N.C. at 321, 446 S.E.2d at 804 ("If <u>at any time</u> Customer's account does not contain the amount of margin and/or premium required by Bradford, Bradford may, <u>at any time, without notice</u> close out Customer's open positions in whole or in part and take any action described in paragraph 9 hereof.") (emphasis in original); Mohammed, 1992 WL 15686, at *1 ("Complainants signed customer agreements in March 1985 and again in June 1988 acknowledging that the futures commission merchant could liquidate positions without notice or demand in the event the account was undermargined."); Capital Options, 1990 WL 180583, at *1-5 (agreement providing that the broker could liquidate its customer's account "at any time Broker deems it necessary for its protection for any reason whatsoever").

None of these cases addresses the particular circumstance presented here, where, LJM alleges, no event of default had occurred, and LJM was still within its contractually-provided window to post additional margin. Cf. Peak Ridge, 930 F. Supp. 2d at 536, 540 ("At the close of business on June 9, the account margin was 5.3:1, short of the 6:1 requirement, as confirmed by an email Morgan Stanley received from Peak Ridge. Morgan Stanley sent written notice of default to Peak Ridge on June 10. . . . Peak Ridge is unable to point to any provision of the Customer Agreement that entitles it to at least one day's notice and an opportunity to cure."). Furthermore, none involved an FCM's alleged election to force liquidation under the terms of a termination clause like Section 24 of the Agreement in this case. The Court therefore cannot conclude that the cases cited by WSF foreclose LJM's proposed amended counterclaim.[9]

---

[9] As WFS correctly notes, both Jacobs and Moss concluded that a contract which required prior notice before liquidation "would be unenforceable as being contrary to federal regulatory policy which mandates that such latitude be given to the broker." Jacobs, 324

CONCLUSION

For the foregoing reasons, LJM's motion for leave to replead its amended counterclaim for breach of contract is granted.  LJM must file its Amended Counterclaims, substantially in the form annexed to its motion,[10] within 14 days of the date hereof.

This Memorandum Opinion and Order resolves docket entry no. 73.

SO ORDERED.

Dated: New York, New York
March 30, 2021

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge

---

Ill. App. 3d at 1007-08, 756 N.E.2d at 281 ("Thus both Moss and Mohammed enunciate the principle that under the federal regulatory scheme, a broker is permitted to liquidate an under-margined account without prior notice. This would be the case even if the contract with the customer required a prior margin call."); Moss, 337 N.C. at 328, 446 S.E.2d at 808 ("In short, we conclude that the pervasive federal regulatory paradigm in the area of futures trading, including CME Rule 827 [the predecessor to Rule 930.K], is designed to afford maximum protection to the commodities merchants and the commodities exchanges themselves and therefore permits the liquidation of a customer's under-margined account without prior demand or notice.") (emphasis in original).  In this case, the question is not one of actual prior notice, but is whether the federal regulatory scheme leaves room for parties to enter into enforceable contracts providing customers specified periods of time to post additional margin before an FCM can liquidate that customer's account.  Neither Moss nor Jacobs addresses that question.

[10]  LJM's Proposed First Amended Counterclaims "retains" its claims for breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and negligence—all of which were dismissed with prejudice in the September Opinion—"so as not to waive any right to potential relief under Rule 54(c), and to preserve LJM's right to appeal the dismissal of the claims." (docket entry no. 69 at ECF page 11.)  WFS does not oppose LJM's continued inclusion of those dismissed claims in its pleading.