UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x

WELLS FARGO SECURITIES, LLC,

Plaintiff,

-v-

No. 1:18-CV-02020-LTS-SLC

LJM INVESTMENT FUND, L.P., and
LJM PARTNERS, LTD.,

Defendants.

-----------------------------------------------------x

LJM INVESTMENT FUND, L.P.,
LJM MASTER TRADING FUND, L.P.,
LJM OFFSHORE FUND, LTD., and
PFC-LJM PRESERVATION AND
GROWTH FUND, L.P.,

Counterclaimants,

-v-

WELLS FARGO SECURITIES, LLC,

Counter-Defendant.

-----------------------------------------------------x

# MEMORANDUM OPINION AND ORDER

In this action, Plaintiff Wells Fargo Securities, LLC ("Plaintiff" or "Wells Fargo" or "WFS") asserts one claim against Defendants LJM Investment Fund, L.P. ("LJM Investment Fund") and LJM Partners, Ltd. ("LJM Partners," and collectively, "Defendants"), alleging that Defendants breached a Futures and Cleared Swaps Agreement entered into between Wells Fargo and LJM Investment Fund. (See docket entry no. 1 ("Compl.") ¶¶ 25-30.)

Defendant LJM Partners and Defendant LJM Investment Fund, along with LJM Master Trading Fund, L.P., LJM Offshore Fund, Ltd., and PFC-LJM Preservation and Growth Fund, L.P. (all the LJM-related entities and, collectively, "LJM"), assert one counterclaim against Plaintiff Wells Fargo (also referred to as "Counter-defendant"). (Docket entry no. 116 ("Second Am. Answer and Countercls." or "SAAC") ¶¶ 61-69.) Counterclaim One of the SAAC alleges that Plaintiff breached the Futures and Cleared Swaps Agreements entered into between Wells Fargo and each of the Counterclaimant LJM funds—LJM Investment Fund, LJM Master Trading Fund, LJM Offshore Fund, and PFC-LJM Preservation and Growth Fund. (Id. ¶¶ 26, 61-69.)

This Memorandum Opinion and Order addresses Plaintiff's motion for summary judgment, which seeks summary judgment on both Count One and Counterclaim One. (Docket entry no. 242.) The Court has jurisdiction of this action under 28 U.S.C. section 1332. The Court has considered carefully the parties' submissions[1] and, for the reasons set forth below, Plaintiff Wells Fargo's motion for summary judgment is denied.

## I. BACKGROUND

The following summary recites only the facts necessary to resolve Plaintiff Wells Fargo's motion for summary judgment. Further background can be found in the Court's prior decisions. (See docket entry no. 47, also available at 2018 WL 4335512; docket entry no. 64,

[1] See docket entry no. 243 ("Pl. Mem."); docket entry no. 244 ("Pl. 56.1 St."); docket entry no. 250 ("Defs. Mem."); docket entry no. 255 ("Def. 56.1 St. and Counterst."); docket entry no. 261 ("Pl. Reply"); docket entry no. 263 ("Pl. 56.1 Counterst."); docket entry no. 265 ("Pl. Notice of Supp. Authority"); docket entry no. 268 ("Def. Sur-reply"); docket entry no. 269 ("Def. Notice of Resp. to Pl. Notice of Suppl. Authority"); docket entry no. 278 ("Defs. Supp."); docket entry no. 279 ("Pl. Opp. Defs. Supp.").

also available at 2019 WL 3553290; docket entry no. 99, also available at 2021 WL 1198931.) Unless otherwise noted, this summary is drawn from undisputed facts.[2] Generally speaking, where facts stated in a party's Local Rule 56.1 Statement are supported by testimonial or documentary evidence and denied with only a conclusory statement by the other party, the Court finds such facts to be true. See LOCAL RULE 56.1(c), (d); Biberaj v. Pritchard Indus., Inc., 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012). Where a nonmoving party fails to respond to a Local Rule 56.1 Statement, the court is "permit[ted] . . . to conclude that the facts asserted in the statement are uncontested and admissible." T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009).

---

[2] Citations to "56.1 St." refer to both Plaintiff-Counter-defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 (docket entry no. 244) and Defendants-Counterclaimants' Response to Plaintiff-Counter-defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 (docket entry no. 255, at 1-47). Citations to "56.1 Counterst." refer to both Defendants-Counterclaimants' Counterstatement of Undisputed Material Facts Pursuant to Local Rule 56.1 (docket entry no. 255, at 48-55) and Plaintiff-Counter-defendant's Response to Defendants-Counterclaimants' Counterstatement of Undisputed Material Facts Pursuant to Local Rule 56.1 (docket entry no. 263). Citations to each of these Local Rule 56.1 statements incorporate by reference the documents and deposition testimony cited therein. See LOCAL RULE 56.1(d).

Deposition transcripts are referred to as "[Name] Dep.": docket entry no. 245-102 ("McBride Dep."); docket entry no. 245-104 ("Bhat Dep."); docket entry no. 245-105 ("Simon Dep."); docket entry no. 245-106 ("Ariathurai Dep."); docket entry no. 245-107 ("Parvataneni Dep."); docket entry no. 245-108 ("Hyde Dep."); docket entry no. 245-110 ("Simonetti Dep."); docket entry no. 245-113 ("Caine Dep."); docket entry no. 245-122 ("Caine Expert Dep."); docket entry no. 256-8 ("Kaufman Dep."); docket entry no. 256-11 ("Ariathurai SEC Dep."). Declarations are referred to as "[Name] Decl.": docket entry no. 251 ("Caine Decl."); docket entry no. 252 ("Parvataneni Decl."); docket entry no. 253 ("McBride Decl.").

Pincites to materials filed on the docket refer to ECF-paginated page numbers.

A. The Parties

Defendant LJM Partners, Ltd. ("LJM Partners") was founded in 1998 by Anthony Caine. (Docket entry no. 100 ¶ 13; docket entry no. 245-11, at 5.) LJM Partners was the general partner that managed trading and strategy for Defendant LJM Investment Fund, L.P., as well as for all of the other LJM Counterclaimant funds, LJM Master Trading Fund, L.P., LJM Offshore Fund, Ltd., and PFC-LJM Preservation and Growth Fund, L.P. (Caine Dep. at 54; docket entry no. 245-1, at 7.) Each of the LJM funds was formed in or around 2014 to 2015. (SAAC ¶ 13.)

Caine led LJM, serving as LJM's Chairman and Portfolio Manager. (See docket entry no. 245-33; Caine Dep. at 45-47.) Caine's "primary responsibilit[ies were] recruiting and developing talented individuals to manage segments of LJM's business, lead[ing] and execut[ing] a corporate culture, and play[ing] a role on the investment team to oversee LJM's investments." (Caine Dep. at 46.) Other key LJM employees included Chief Compliance Officer Katy McBride, Chief Portfolio Manager Anish Parvataneni, and Chief Risk Officer Arjuna Ariathurai. (Docket entry no. 245-33.) McBride managed LJM's compliance program. (McBride Dep. at 14-16.) Parvataneni's "primary responsibilit[ies were] to execute the strategy and manage the positions [and] make trading decisions to adjust the portfolios." (Parvataneni Dep. at 16-17.) Parvataneni also oversaw Associate Portfolio Manager Edward Bandemer, Senior Quantitative Strategist Yang Xu, and Analyst Gaurav Bhat. (Docket entry no. 245-33.) Ariathurai "identif[ied] and assess[ed] risks that went with the enterprise operations," including "market risk[s]." (Ariathurai Dep. at 8, 129-30.) Ariathurai was also responsible for managing LJM's relationships with its futures commission merchants ("FCMs"), such as Wells Fargo, which provided clearing and execution services for LJM to trade derivatives on the Chicago Mercantile Exchange ("CME"). (Caine Dep. at 65; Parvataneni Dep. at 93.)

B. The FCM Agreements

The relationship between Wells Fargo and LJM was governed by a Futures and Cleared Swaps Agreement (the "FCM Agreement").[3] (56.1 St. ¶¶ 19-21; see docket entry nos. 245-3, 245-6, 245-8.) That agreement "sets forth the terms and conditions pursuant to which Wells Fargo Securities . . . acting as a futures commission merchant . . . and Customer [LJM] . . . have agreed shall govern the purchase, sale, execution, clearing and carrying of derivatives products cleared through WFS." (Docket entry no. 245-3 ("FCM Agreement") at 1.)

Section 19 of the FCM Agreement gives Wells Fargo certain rights upon an "Event of Default." An "Event of Default" occurs when, inter alia, "Customer [LJM] fails to comply with any provision of, or perform any obligation under, [the FCM] Agreement" (FCM Agreement § 18(a)); "any representation or warranty made by Customer [LJM] is not or ceases to be correct or true in any material respect" (FCM Agreement § 18(f)); or "Customer [LJM] states that it will not perform any obligation to Wells Fargo under this Agreement . . . or that it is unable to pay its debts upon maturation" (FCM Agreement § 18(g)). "Upon the occurrence of an Event of Default," Wells Fargo has, inter alia, the right to:

> (b) close out, liquidate, terminate or net at such times as WFS deems appropriate, any or all open Derivatives and other positions . . . in Customer's [LJM's] Account . . . and (h) take such other actions as WFS, in its discretion, deems necessary or appropriate for its protection, all without additional demand for Margin and without notice or advertisement.

3 Wells Fargo entered into a Futures and Cleared Swaps Agreement with each of the LJM funds (LJM Investment Fund, L.P., LJM Master Trading Fund, L.P., LJM Offshore Fund, Ltd., and PFC-LJM Preservation and Growth Fund, L.P.). Because each of these agreements is substantively identical, the Court generally cites a single FCM Agreement—that between Wells Fargo and LJM Investment Fund. (See docket entry nos. 245-3, 245-6, 245-8.)

(FCM Agreement § 19.) Under Section 19, these rights accrue to Wells Fargo "[u]pon the occurrence of an Event of Default"—without any express requirement of written notice. (See id.)

Section 24 provides for termination for convenience: "This Agreement may be terminated at any time by Customer [LJM] or WFS by written notice to the other." (FCM Agreement §24.) "In the event of a notice terminating this Agreement, Customer [LJM] shall either close out open positions in the Account or arrange for such open positions to be transferred to another FCM promptly." (Id.)

C. LJM's Trading Strategy

LJM's trading strategy involved the purchase and sale of call and put options on S&P 500 Index futures contracts on the Chicago Mercantile Exchange ("CME"). (56.1 St. ¶ 1.) S&P 500 Index futures are contracts to buy or sell a specified future value of the S&P 500 Index at a specified future time. (56.1 St. ¶ 11.) A single S&P 500 Index future on the CME is valued at 250 times the value of the S&P 500 Index. (Docket entry no. 135 ¶ 17.) The CME also offers an "E-Mini" futures contract, which is the same as a regular futures contract, except it is 1/5th the size of a regular S&P 500 Index futures contract (i.e., 50 times the value of the S&P 500 Index). (Id.) A call option on an S&P 500 Index futures contract offers the holder of the option the right to purchase the futures contract at a specified price (the strike price) at or before a specified future time (the expiry date). (Id. ¶ 18.) A put option on an S&P 500 Index futures contract offers the holder of the option the right to sell the futures contract at a specified price (the strike price) at or before a specified future time (the expiry date). (Id.)

LJM's trading strategy was based exclusively on transactions in options and, until February 6, 2018, LJM never traded futures in a managed account at Wells Fargo. (56.1

Counterst. ¶ 90.) LJM did trade futures in one of its accounts at another FCM around 2012 or 2013. (Id. ¶¶ 90-91.) According to Caine, the results of that earlier futures trading were "disastrous," and LJM never again considered trading futures. (Caine Dep. at 87-88; see also Caine Decl. ¶ 5.) Nonetheless, LJM's disclosure documents stated that LJM could trade futures. (56.1 St. ¶¶ 16-18; 56.1 Counterst. ¶ 90.) For example, LJM's due diligence questionnaire stated that "LJM has the ability to trade futures contracts in the event that the options markets face liquidity issues during extreme stress events." (56.1 St. ¶ 18.) Caine explained that the language in LJM's disclosure documents was merely "boilerplate" that was "not a representation of what LJM strategies were and how [LJM] executed." (Caine Expert Dep. at 45; see also Caine Decl. ¶ 6.)

LJM's strategy was to be a "net seller" of options because it believed the market systematically overpriced options. (Docket entry no. 245-15, at 5-7; see also Parvataneni Dep. at 17, 19-20, 21; Caine Dep. at 66.) Among other things, the price of an option (also referred to as the option premium) depends on volatility. (56.1 St. ¶ 10.) LJM sought to profit from "the difference between the implied volatility (investors' forecast of market volatility reflected in options pricing) and realized (actual) market volatility." (Docket entry no. 245-15, at 5; see also Parvataneni Dep. at 17; Caine Dep. at 66.) Because LJM sold options, it profited when the options it sold stayed "out-of-the-money," meaning that the holder of the option would not exercise the call (or put) option because the price of the underlying futures contract was lower (or higher) than the strike price. (Docket entry no. 245-17, at 2; Parvataneni Dep. at 22-24; Caine Dep. at 72-73.)

The parties dispute the robustness of LJM's trading and risk management strategies, in particular with respect to high market volatility events, such as the February 5, 2018

"Volmageddon" event that gave rise to this action. See infra pp. 9-10. Wells Fargo contends that "LJM had no 'tested liquidation and risk management procedure.'" (Pl. Mem. at 7.) LJM employees testified that there was no detailed formal, written trading strategy. (56.1 St. ¶¶ 2, 4 (citing the depositions of Caine, Ariathurai, Parvataneni, Bhat, and Xu).) Rather, LJM itself described its trading strategy as "100% discretionary." (56.1 St. ¶ 3.) LJM employees also testified that there was no "special risk management that applied during [] volatility spikes." (Ariathurai Dep. at 63; see also Parvataneni Dep. at 59-60; Bhat Dep. at 45-46.) According to Wells Fargo, LJM's trading strategy consisted entirely of managing "three informal 'categories'": monitoring "breakevens"—the S&P 500 Index values above and below which LJM's portfolio would suffer losses; distinguishing between macroeconomic trends and market "noise"—and keeping LJM's exposure to the S&P 500 Index (i.e., LJM's "delta") close to, or slightly below, zero. (56.1 St. ¶¶ 6-9.) The "delta" of an option measures how much the price of an option changes relative to the price of the underlying asset. (56.1 St. ¶ 12.)

LJM disputes Wells Fargo's characterization of its trading strategy. LJM claims it developed "robust risk management strategies" to weather "high volatility events." (Defs. Mem. at 14.) According to LJM, these strategies primarily sought to increase the probability that the options it sold expired out-of-the-money. (56.1 St. ¶¶ 4-5.) For example, LJM would close options that were at risk of being in-the-money and open new positions that were lower risk (i.e., options rolling). (56.1 St. ¶ 93; see also Caine Dep. at 95-101; Caine Decl. ¶¶ 16-17; Parvataneni Dep. at 253-56, 260-62, 266, 279-85; Parvataneni Decl. ¶¶ 12-13.) LJM also believed high volatility events were "mean-reverting," meaning that sudden spikes in volatility were short-lived. (Caine Decl. ¶¶ 23-24; Caine Dep. at 107-109; Parvataneni Decl. ¶¶ 19-20; Parvataneni Dep. at 301.) LJM asserts that it would weather high volatility events by

"iteratively" closing out high risk positions and rolling those into lower risk positions and by hedging, selectively taking positions on the other side of the market move. (Caine Decl. ¶¶ 23-24; Caine Dep. at 107-109; Parvataneni Decl. ¶¶ 19-20; Parvataneni Dep. at 301.) Furthermore, LJM proffers evidence that it had previously managed to recover successfully from high volatility events. (56.1 Counterst. ¶ 94.) Finally, LJM explains that its approach to high volatility periods was consistent with and an outgrowth of its general risk management principles. (56.1 St. ¶ 4.)

D. February 5, 2018: Volmageddon

In the days leading up to February 5, 2018, several of LJM's funds exhibited high risk. (56.1 St. ¶¶ 26-30, 33-36.) The Chicago Mercantile Exchange measures the risk of portfolios using "SPAN," or "Standard Portfolio Analysis of Risk." (56.1 St. ¶¶ 26-27.) The SPAN for several of LJM's funds exceeded their so-called initial margin limits ("IMLs"), which were risk limits set by Wells Fargo. (56.1 St. ¶¶ 24-30, 33-36.)

On Monday, February 5, 2018—which has been termed "Volmageddon"—the S&P 500 Index dropped by 4.1%, and the VIX Index, which measures market volatility, rose by 115.6%. (56.1 St. ¶ 37.) This was the largest single-day percentage increase in the history of the VIX Index up to that point, and the S&P 500 Index suffered its largest one-day point drop since 2011. (Id.) Wells Fargo claims that LJM suffered "catastrophic losses" that day (see Parvataneni Dep. at 249), but LJM contends that these losses were merely "temporary 'mark-to-market losses' on paper" because "losses on options are not realized until disposition or expiry of the option" (Caine Decl. ¶ 20; id. ¶ 30 (describing any losses as "unrealized theoretical losses"); see Parvataneni Dep. at 34-35 (explaining that "implied volatility movements . . . were just

mark-to-market losses" and that "mark-to-market losses then become realized losses" when an option is closed)).

Wells Fargo further claims that LJM faced the potential for even greater losses because of the way in which LJM had constructed its portfolios. (Ariathurai Dep. at 157-59 (explaining that Volmageddon was "probably the worst thing that could happen" because it was something that LJM "specifically bet[] that [wouldn't] happen"); id. at 203-204 (explaining the mechanics of the risk that Volmageddon posed); docket entry no. 245 ¶¶ 54-67 (expert report explaining the same).) For its part, LJM asserts that it believed that the volatility spike was "mean-reverting" and that LJM could reduce risk using the trading strategies it had used in prior high volatility events—namely, by hedging and "iteratively" closing out high risk positions and rolling those into lower risk positions. (Caine Decl. ¶¶ 23-24; Caine Dep. at 107-109; Parvataneni Decl. ¶¶ 19-20; Parvataneni Dep. at 301.)

E. February 5, 2018: Following Volmageddon, LJM Prepares for the Next Day

After trading closed at 3:15 PM CST[4] on the day of Volmageddon, February 5, 2018, the LJM team stayed late. (Parvataneni Dep. at 252-54; see Caine Dep. at 161.) The team first updated Caine, who was in Colorado recovering from a knee operation and did not look at the markets until the end of the day. (Parvataneni Dep. at 252-53; Ariathurai Dep 177-78; Caine Dep. at 160-61.) The LJM team then discussed how to address Volmageddon, including discussing operations and investor communications and their trading strategy for the next day. (Parvataneni Dep. at 253-55.)

4 Unless otherwise noted, this Memorandum Opinion and Order uses CST because the events primarily occurred in Chicago.

The parties dispute whether LJM had a concrete trading strategy to handle Volmageddon; Wells Fargo contends LJM had none, and LJM asserts it had one. Wells Fargo points to Parvataneni's testimony that "[w]e would not know" a trading strategy because "we had to wait for the markets to open." (Parvataneni Dep. at 254.) Parvataneni also attests that he "did not generate a formal trading plan the night of February 5, 2018." (Parvataneni Decl. ¶ 31.) Even as of the morning of February 6, Parvataneni "hadn't decided for sure yet" "on the trading plan for" that day. (Parvataneni Dep. at 261-62.) In rebuttal, LJM proffers Caine's testimony that "[e]very time we would have a volatility event or just in the normal day of [] operation, we would be making this analysis [of trading plans] . . . [o]ne to two hours before" "the market [opened]." (Caine Dep. at 218-19.) According to LJM, by the time that LJM would have developed a concrete strategy the morning of February 6, 2018, Wells Fargo had already directed LJM to undertake Wells Fargo's trading strategy. (Caine Dep. at 219 ("[W]e weren't provided that opportunity [to implement our own trading strategy]. The decision was already made for us that short E-mini futures were going to go into the portfolios.").)

LJM further contends, and WFS disputes, that, "[o]n the morning of February 6, 2018, prior to any call by [Wells Fargo], LJM planned to await market open and proceed patiently, in an iterative manner, to close out short puts, close out short calls and close out open strangles at limit orders at timing when volatility contracts to efficiently preserve investor capital until the high volatility event subsided." (56.1 Counterst. ¶ 124.) This was how LJM had managed prior high volatility events. (See supra pp. 6-9.) As Caine testified, LJM would "close our positions at risk, move them to positions of less risk, possibly longer duration, possibly further out of the money. [And, w]e may balance with premium on the other side." (Caine Dep. at 98; see also id. at 176 ("I had experience knowing that before knee-jerk reacting, the liquidity

and circumstances as you get minutes into the open always improve. And the prudent thing to do was—even if the market was down, was to wait through the open and start to iteratively adjust the portfolios.").) Caine had offered that same explanation in an email to an investor on the afternoon of February 5th, 2018, writing that "[w]e will most likely be paring positions to reduce risk" and will "make adjustments to reduce further vol risks." (Docket entry no. 268-3, at 1.)

Similarly, Parvataneni testified that the "options strategy" would have been to "[m]ove the closer-to-the-money puts out farther and farther and farther" and that "there will be some mark-to-market losses with a possibility of recovery." (Parvataneni Dep. at 280.) According to Parvataneni, in connection with a prior volatility event, LJM had managed risk with a "wait it out" strategy; in other words, by waiting the volatility spike out. (Parvataneni Dep. at 282-85.) Parvataneni explained that, following Volmageddon, "one of the choices was, to do nothing at open, wait for the frenzy to die"; this would stabilize LJM's portfolio. (Parvataneni Dep. at 282-85.) Parvataneni also testified that, during the trading day on February 5, 2018, LJM had made options trades in response to Volmageddon, but had difficulty in executing the trades at the speed, volume, or prices it wanted. (Parvataneni Dep. at 250-52.) Also, one of LJM's FCMs failed to accurately report to Wells Fargo certain trades LJM had made on February 5. (56.1 Counterst. ¶¶ 107-109.)

F. <u>February 5-6, 2018: Wells Fargo Directs LJM to Immediately Sell E-Mini Futures and Liquidate its Accounts</u>

Following Volmageddon, on the evening of February 5, Wells Fargo had internal discussions about terminating LJM's accounts. (56.1 Counterst. ¶¶ 114-16.) At around 8:00 PM, George Simonetti, Managing Director and Head of Global Exchange Traded Services at Wells Fargo, spoke with Ariathurai. (56.1 St. ¶ 42; 56.1 Counterst. ¶ 120.) Ariathurai testified that Simonetti told him that Wells Fargo was "going to put [LJM] in liquidation." (Ariathurai SEC Dep.

at 323; Ariathurai Dep. at 273-74 (testifying that Wells Fargo was "going to send us a liquidation notification").) Simonetti testified that he could not recall this conversation. (Simonetti Dep. at 217.) Shortly after his February 5 call with Simonetti, Ariathurai emailed two of LJM's other FCMs, indicating that "LJM will be moving to eliminate most if not all positions on the open and during the day tomorrow." (Docket entry no. 245-45 (8:18 PM email); see also docket entry no. 245-73, at 2 (8:22 PM email).)

Early on the morning of the next day, February 6, 2018, at around 5:00 AM, Ariathurai and Simonetti had another phone call. (56.1 St. ¶ 52.) The two discussed whether LJM would consider trading E-mini futures before the market opened in order to mitigate some of LJM's risk. (56.1 St. ¶ 54.) Simonetti also told Ariathurai that Wells Fargo was immediately terminating the parties' business relationship, including all of LJM's accounts at Wells Fargo. (56.1 Counterst. ¶ 125.) The parties dispute whether, during this phone call, Simonetti directed Ariathurai or LJM to undertake any specific trading action or strategy. (56.1 St. ¶ 55.) LJM points to Ariathurai's prior testimony in a related action: that Simonetti "urged me to sell [futures] to preclude the possibility of loss." (Ariathurai SEC Dep. at 324.) According to LJM, Ariathurai believed LJM had to follow Wells Fargo's directive or Wells Fargo would seize control of LJM's portfolio and make the trade itself. (Ariathurai Dep. at 215 (testifying that "there's a possibility that if this escalates that they [Wells Fargo] could just . . . liquidate the positions in their discretion in order to cover whatever they viewed as . . . a risk").) Wells Fargo, on the other hand, points to Ariathurai's testimony that "[Simonetti] did not direct me in any way. Any urging he did was to consider selling futures." (Ariathurai Dep. at 279.) Wells Fargo also points to Simonetti's testimony that his recollection of the conversation is that he believed LJM did not "really have much choice" because "if the options market wasn't a viable solution

to reduce more risk" due to liquidity issues caused by Volmageddon, "futures was an option" to do so. (Simonetti Dep. at 188-89.)

Following the call, Ariathurai updated the LJM team on what Simonetti had told him: that Wells Fargo was terminating its entire business relationship with LJM, ordering LJM to sell E-mini futures, and directing LJM to liquidate its accounts. (Caine Decl. ¶¶ 35-39; Parvataneni Decl. ¶¶ 32-34; McBride Decl. ¶¶ 3-4; Caine Dep. at 169-70, 172, 174; Parvataneni Dep. at 264-66, 302; McBride Dep. at 92-93.).[5]

Caine asked Ariathurai for Simonetti's phone number, and Caine immediately called Simonetti. (Caine Dep. at 170; Caine Decl. ¶ 40.) In his conversation with Simonetti, Caine asked Simonetti whether Wells Fargo was terminating the FCM Agreement and, according to Caine, Simonetti said, "Yes, we are terminating your operating agreements." (Caine Dep. at 178; see also Caine Decl. ¶¶ 40-43.) Caine also protested against selling E-mini futures, explaining that "shorting E-mini futures would be a bad trade for LJM clients; could be a disastrous result in that we would have better means to do it and asked if we could wait till the open [of the market]." (Caine Dep. at 179; see also Caine Decl. ¶¶ 40-43.) According to Caine, Simonetti replied: "It's individuals beyond me. Other individuals are involved. . . . You must

[5] Caine received updates separately from the rest of the LJM team because he was not at LJM's offices in Chicago. (See 56.1 St. ¶ 58; McBride Decl. ¶ 3; Parvataneni Decl. ¶ 34; Caine Decl. ¶¶ 35-36.) Parvataneni testified that Ariathurai told him that "Wells Fargo terminated our contract. I just got off the phone with George [Simonetti]. [Wells Fargo] want us to liquidate all our positions, and before that they want us to trade E-mini futures short." (Parvataneni Dep. at 264-65; see also Parvataneni Decl. ¶¶ 32-34.) Similarly, Caine testified that Ariathurai "reiterated that our operating agreements were being terminated; that Wells Fargo insisted that we remove risk before the markets; insisted that—directed that we must start shorting E-mini futures to place into the portfolios." (Caine Dep. at 169-70; see also Caine Decl. ¶¶ 35-39.) McBride also testified that she heard the same from Ariathurai. (McBride Dep. at 92-93; McBride Decl. ¶¶ 3-4.)

start removing risk now. You must start moving with the E-mini—E-mini futures." (Caine Dep. at 179; see also Caine Decl. ¶¶ 40-43.) When Caine protested, Simonetti allegedly responded, "I understand your concerns, but you must start doing it." (Caine Dep. at 179; see also Caine Decl. ¶ 41 (describing Simonetti's directive as a "gun to my head").) Parvataneni and McBride attest that, after Caine's call with Simonetti, Caine told them that Wells Fargo demanded that LJM liquidate. (Parvataneni Decl. ¶ 35; McBride Decl. ¶ 7.)[6]

Wells Fargo does not dispute the fact that Caine called Simonetti to protest against selling E-mini futures. (56.1 Counterst. ¶¶ 126, 128-29.) Wells Fargo contends, however, that by the time Caine spoke with Simonetti, LJM had "already started to short . . . the futures." (56.1 Counterst. ¶ 126 (quoting Caine Dep. at 178-80).) Simonetti could not recall whether he spoke with Caine on the morning of February 6, 2018; he could only recall an afternoon conversation with Caine that day. (Simonetti Dep. at 184.)

G. February 6, 2018: Wells Fargo Employees Simon and Hyde Oversee the Sale of E-mini Futures and Liquidation

At around 7:30 to 7:45 AM on February 6, 2018, two Wells Fargo employees, Risk Manager Robert Simon and Director of Global Exchange Traded Services John Hyde,

---

6 Wells Fargo urges the Court to disregard the declarations of Caine, Parvataneni, and McBride because, according to Wells Fargo, those declarations are sham affidavits. (Pl. Reply at 8.) Wells Fargo, however, fails to show that these declarations "inescapabl[y] and unequivocal[ly]" contradict prior deposition testimony. See In re Fosamax Prod. Liab. Litig., 707 F.3d 189, 194 (2d Cir. 2013) ("emphasiz[ing] that a sham issue of fact exists only when the contradictions in a[] witness's testimony are inescapable and unequivocal in nature" and exclusion is appropriate where there is no "readily apparent, plausible explanation for these inconsistencies"); Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 106 (2d Cir. 2011) ("'[I]f there is a plausible explanation for discrepancies in a party's testimony, the court . . . should not disregard the later testimony because an earlier account was ambiguous, confusing, or simply incomplete.'" (quoting Jeffreys v. City of New York, 426 F.3d 549, 555 n.2 (2d Cir. 2005))).

arrived at LJM's offices in Chicago. (Docket entry no. 256-13, at 6; Simon Dep. at 200; see also 56.1 St. ¶ 78.)

LJM contends that Simon and Hyde were there to act as "overseers" and to enforce the Wells Fargo's directed E-mini futures sale and liquidation. (56.1 St. ¶ 79; see also Hyde Dep. at 241-42, 196; Ariathurai Dep. at 282-83.) Indeed, the day before, Simon's superior mentioned to Simon that "[w]e may ask you to go over and baby sit our friends at LJM tomorrow to make sure they are liquidating." (Docket entry no. 256-33.) Parvataneni also testified that, while the two were at LJM's office, Simon and Hyde "ask[ed] us [LJM] to move the E-minis—selling the E-minis faster." (Parvataneni Dep. at 267.) Hyde even arranged for Wells Fargo to execute E-mini sales because LJM's executing broker was unable to execute the sales at sufficient magnitude. (Parvataneni Dep. at 267; 56.1 Counterst. ¶ 132.) Finally, there is evidence that Parvataneni directly voiced his objections to the E-mini futures sale to Hyde. (Hyde Dep. at 252-60; see Parvataneni Decl. ¶¶ 36-37.) Wells Fargo disputes LJM's narrative and claims that Hyde and Simon were merely there to monitor and report. (56.1 St. ¶ 79.)

H. February 6, 2018: Wells Fargo Makes Demands for Margin and Sends Termination Notices

Also on the morning of February 6, 2018, Wells Fargo made demands for margin payments. (56.1 St. ¶ 43.) In total, Wells Fargo demanded nearly $1.5 billion in margin from LJM's funds, including $101 million from Defendant LJM Investment Fund. (Docket entry no. 245-48, at 3.) Wells Fargo contends that LJM could not satisfy the margin call, which LJM disputes. (56.1 St. ¶ 44.)

That same morning, at 7:36 AM, Simonetti sent termination notices to LJM. (Docket entry nos. 245-51, 245-43.) Each of these notices stated: "Pursuant to section 24 of the Futures and Cleared Swaps Agreement . . ., WFS is hereby serving notice that the Agreement is

to be terminated effective February 6, 2018. Please promptly close out or transfer any open positions in the account." (Docket entry no. 245-43.)

I. February 6, 2018: LJM Sells E-Mini Futures and Liquidates Its Accounts

It is undisputed that on the morning of February 6, 2018, before the markets opened at 8:30 AM, LJM ultimately decided to sell (i.e., short)—and did in fact sell—E-mini futures. (56.1 St. ¶¶ 67-68; docket entry no. 245-49.) The parties dispute, however, whether LJM's decision was voluntary or coerced by Wells Fargo. Wells Fargo claims that it did not force LJM to sell E-mini futures, and that LJM's decision was voluntary because the LJM team believed that selling E-mini futures was the best approach to reducing risk. (See 56.1 St. ¶¶ 59, 62-65.) LJM counters that Wells Fargo "coerce[d] LJM into acceding to the forced E-Mini hedge." (Defs. Mem. at 46; see 56.1 St. ¶¶ 59, 62-65.) LJM alleges that it believed that Wells Fargo would "seize control" of its accounts and make the E-mini futures trades itself if LJM objected. (56.1 St. ¶¶ 55, 58; see Ariathurai Dep. at 215, 289; Parvataneni Dep. at 266.)

At or around the same time that LJM began selling E-mini futures—on the morning of February 6, 2018, before the markets opened at 8:30 AM—LJM began to liquidate its accounts. (56.1 St. ¶ 67; Bhat Dep. at 174-76; Simon Dep. at 236-37; Simonetti Dep. at 67-68, 144.) Again, the parties dispute whether LJM's decision was voluntary or whether it was coerced by Wells Fargo. (See 56.1 St. ¶¶ 58-59, 56.1 Counterst. ¶¶ 119-32.) Wells Fargo points to LJM's contemporaneous communications to investors in which LJM stated that the liquidation was voluntary. (56.1 St. ¶¶ 66, 69-70, 72-73, 76; McBride Dep. at 105-106; McBride Decl. ¶¶ 8, 13; Caine Decl. ¶¶ 50-52.) LJM claims that the investor communications fail to accurately reflect the underlying situation because they were also efforts to avoid exacerbating conflict in

the relationship with Wells Fargo. (56.1 St. ¶¶ 66, 69-70, 72-73, 76; McBride Dep. at 105-106; McBride Decl. ¶¶ 8, 13; Caine Decl. ¶¶ 50-52.)

J. February 6, 2018: The Markets Open

The markets opened at 8:30 AM on February 6. (Caine Dep. at 219.) Shortly after open, the markets began to recover as the S&P began to stabilize and the VIX spike began to recede. (56.1 Counterst. ¶ 133.)

LJM claims that it was unable to take advantage of the market recovery because the pre-open sale of E-mini futures locked in LJM's losses from the prior day. (Parvataneni Dep. at 303 ("The futures trade locked in losses.").) LJM further submits that, while the sales of E-mini futures hedged against the risk that the S&P would fall, the sales exposed LJM to the risk that the S&P would rebound, which was what happened on February 6, 2018. (Caine Decl. ¶¶ 38-39; Parvataneni Decl. ¶ 36.) Indeed, Parvataneni claimed that, had LJM not made any trades on February 6, LJM's accounts would have been up by over 20% at market close intra-day. (Parvataneni Dep. at 303.)

K. February 6, 2018: LJM Liquidates the Rest of Its Portfolio and Other, Non-Wells Fargo Accounts

According to LJM, Wells Fargo allowed LJM to stop selling E-mini futures by the afternoon of February 6, 2018. (SAAC ¶ 51; Caine Decl. ¶ 51.) Caine attests that, by that time, the E-mini trades "had irreversibly damaged the portfolios and the WFS directed liquidation was essentially complete." (Caine Decl. ¶ 51.) Caine explained that "[p]utting the E-mini futures into our portfolio constructed dynamics in a portfolio that weren't our strategy. It was something we had never had before in our portfolios." (Caine Dep. at 184; see also id. at 185 (describing it as "an alien portfolio").) The sale of E-mini futures "eliminated all possibility for us to do a more incremental iterative adjustment as we had done in previous volatility events." (Caine Dep.

at 184.) LJM's portfolio was now unhedged and unbalanced. (Caine Dep. at 185-86 ("[N]ormally we would have balance between our short calls and short puts. That—without the balance on the other side [because of the sale of E-mini futures], those short calls were going to exacerbate losses."); Caine Decl. ¶¶ 37-39; Parvataneni Dep. at 280.) If LJM "didn't [close out positions] and the market kept going up, the losses would have been exacerbated." (Caine Dep. at 190.) Accordingly, at around 1:30 PM on February 6, LJM decided to "shut down all positions" at Wells Fargo. (Caine Dep. at 191.)

LJM also proceeded to liquidate its accounts with other FCMs—even though these other FCMs had not demanded liquidation, terminated their FCM agreements, nor placed limits on LJM's trading—because LJM's compliance policy was to trade similar accounts with similar strategies. (Caine Dep. at 191-92; Caine Decl. ¶ 44; Parvataneni Dep. at 287-88.)

L. <u>February 6, 2018: Wells Fargo Rescinds the Termination Notice</u>

At 3:17 PM on February 6, 2018, Wells Fargo issued recissions of the termination notices. (56.1 Counterst. ¶ 134.) These rescissions purported to "hereby rescind[] the Termination Notice [from that morning] and reinstate[] the [FCM] Agreement effective immediately." (Docket entry no. 256-41.)

M. <u>February 9, 2018 and Onwards: Wells Fargo Threatens, and Eventually Takes, Action</u>

On February 9, 2018, Wells Fargo sent LJM Investment Fund a Notice of Event of Default. (Docket entry no. 245-85.) The Notice of Event of Default stated that on February 6, 7, and 8, Wells Fargo had demanded that LJM "deposit Margin in its Account" under Section 10

of the Agreement.[7] (Docket entry no. 245-85.) According to the Notice, LJM's failure to meet the margin demands constituted an "Event of Default" under Section 18(a) of the Agreement. (Docket entry no. 245-85.)

On February 12, 2018, Wells Fargo sent termination notices to the remaining LJM funds (i.e., LJM Master Trading Fund, L.P., LJM Offshore Fund, Ltd., and PFC-LJM Preservation and Growth Fund, L.P.). (56.1 Counterst. ¶ 136.) These termination notices purported to terminate the FCM Agreements pursuant to Section 24 of the Agreements. (Docket entry no. 256-42.)

On February 26, 2018, Wells Fargo sent a letter to LJM Investment Fund, accusing LJM Investment Fund of continuing to "breach[] its obligation to make a margin deposit of $16,367,911.62 as demanded by WFS." (Docket entry no. 256-43.) Less than two weeks later, Wells Fargo filed the instant action against LJM seeking, among other things, recovery of the $16,367,911.62 debit allegedly owed by LJM. (Docket entry no. 1, at 7.)

## II. Discussion

Plaintiff-Counter-defendant Wells Fargo moves for summary judgment on its claim for breach of contract, as well as on Defendants-Counterclaimants LJM's counterclaim for breach of contract. Wells Fargo seeks an award of damages on its claim and dismissal of LJM's counterclaim. Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

7 The Notice of Event of Default stated that Wells Fargo had demanded $101,815,204.64 on February 6, $35,831,985.04 on February 7, and $16,367,911.62 on February 8 and that LJM had failed to meet each of these demands. (Docket entry no. 245-85.)

judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is considered material if it "might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, (1986)). The nonmoving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004) (citation modified).

"When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." Simsbury-Avon Pres. Soc'y, LLC v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). In that event, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Id. (citing Celotex, 477 U.S. at 322-23). "Where no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment must be granted." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (citation omitted).

In determining whether there is a genuine issue of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Johnson v. Killian, 680 F.3d 234, 236 (2d

Cir. 2012) (citation omitted). Under New York law,[8] "the elements of a breach of contract claim are: (i) the existence of a contract, (ii) performance of the contract by one party, (iii) breach by the other party, and (iv) damages." Johnson v. Clearview AI, Inc., No. 23-CV-2441-KPF, 2024 WL 2274267, at *5 (S.D.N.Y. May 20, 2024) (citing Terwilliger v. Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000)). Plaintiff-Counter-defendant Wells Fargo and Defendant-Counterclaimant LJM each accuse the other of breaching the terms of the FCM Agreement.[9] The Court first addresses Wells Fargo's claim and then turns to LJM's counterclaim.

## A. Wells Fargo's Breach of Contract Claim

Wells Fargo advances three arguments in support of its motion for summary judgment on its breach of contract claim against LJM. As explained below, genuine disputes of material fact bar summary judgment and, accordingly, Wells Fargo's motion is denied.

### 1. Breach of Sections 2 and 11 of the FCM Agreement

First, Wells Fargo contends that LJM breached Sections 2 and 11 of the FCM Agreement by failing to pay the $16,367,911.62 balance in its LJM Investment Fund account. Section 2 provides that "Customer [LJM] and not WFS is responsible and liable for any losses arising from Derivatives entered into in Customer's Account." (FCM Agreement § 2.) Section 11 provides:

> Customer [LJM] agrees to pay such other costs or expenses incurred in connection with Derivatives, including without limitation: . . . (iii) any

---

[8] Section 29 of the FCM Agreement provides that the governing law is that of New York. (FCM Agreement § 29.)

[9] Wells Fargo alleges breach of the FCM Agreement entered into between Wells Fargo and LJM Investment Fund, and LJM alleges breach of each FCM Agreements entered into between Wells Fargo and each of the Counterclaimant LJM funds. Because each of the FCM Agreements is substantively identical, the Court generally refers to a single FCM Agreement—that between Wells Fargo and LJM Investment Fund. (See docket entry nos. 245-3, 245-6, 245-8.)

> trading losses, periodic payments, premiums, debit balance, deficiency, or other liability related to the Account; . . . and (v) any other charges or costs incurred by WFS with respect to the Account, including, but not limited to, reasonable attorneys' fees incurred in collecting any unpaid debit balance or deficiency.

(FCM Agreement § 11.) Under the plain language of Sections 2 and 11, LJM owes Wells Fargo the remaining debit of $16,367,911.62 in the LJM Investment Fund account. LJM, however, has proffered evidence from which a factfinder could conclude that, because of Wells Fargo's prior material breach, LJM's performance under the FCM Agreement is excused.

"Under New York law, when one party has committed a material breach of a contract, the non-breaching party is discharged from performing any further obligations under the contract . . . ." NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd., 262 F. Supp. 2d 134, 145 (S.D.N.Y. 2003). "[A] breach is material if it defeats the object of the parties in making the contract and 'deprive[s] the injured party of the benefit that it justifiably expected.'" ESPN, Inc. v. Off. of Com'r of Baseball, 76 F. Supp. 2d 416, 421 (S.D.N.Y. 1999) (quoting FARNSWORTH, CONTRACTS § 8.16 (3d ed. 1999)(second alteration in original)). As explained below, LJM has proffered sufficient evidence to create genuine dispute of material fact as to whether Wells Fargo breached Section 24 of the FCM Agreement. See infra pp. 28-30. Accordingly, because a material breach would excuse LJM of any responsibility for the alleged debit balance under New York law, Wells Fargo's first argument in support of its motion for summary judgment fails. See Celotex, 477 U.S. at 322-23

2. Breach of Section 15 Triggered an "Event of Default," Giving Wells Fargo Section 19 Rights

Next, Wells Fargo contends that it had the right, under Section 19, to demand that LJM sell E-mini futures sales and liquidate because one or more "Events of Default" had occurred, asserting that its rights under Section 19 operate notwithstanding the termination

process set forth in Section 24. (See FCM Agreement § 19 (allowing Wells Fargo, "[u]pon the occurrence of an Event of Default," to "close out, liquidate, terminate or net at such times as WFS deems appropriate, any or all open Derivatives and other positions . . . in Customer's [LJM's] Account . . . [and] take such other actions as WFS, in its discretion, deems necessary or appropriate for its protection, all without additional demand for Margin and without notice or advertisement").) Wells Fargo argues that the "Event of Default" here was LJM's breach of Section 15, which provides that "WFS shall set its own risk limits for Customer which shall be advised to Customer from time to time and Customer shall comply with all such limits." (FCM Agreement § 15; see also id. § 18(a) (providing that LJM defaults where it "fails to comply with any provision of, or perform any obligation under, [the FCM] Agreement").) Wells Fargo contends that it set a "risk limit," as that term is used in Section 15, called an "initial margin limit" ("IML"), for each LJM fund, and that the risk of each LJM fund, as measured by SPAN, exceeded the IML. (56.1 St. ¶¶ 28-30, 33-36, 45; Pl. Mem. 44-45).)

Nowhere, however, are the terms "IML" or "initial margin limit" used in the FCM Agreement, and Wells Fargo can provide no textual explanation for how "risk limit" unambiguously means IML, or facts supporting it's interpretation that IML was a "risk limit" under the meaning of Section 15. (See 56.1 St. ¶ 24-25.)[10] Instead, in documentary evidence, Wells Fargo itself described IML as "a monitoring tool" that is "not necessarily a 'hard' risk control[] that [is] enforced prior to and immediate[ly] after an assigned limit is breached." (Docket entry no. 256-7, at 2; see also docket entry nos. 256-6 at 2; Kaufman Dep. at 112; 56.1 St. ¶¶ 24-25; 56.1 Counterst. ¶¶ 98-101.) Similarly, Wells Fargo explained that "it would be

10 For this reason, the Court rejects as meritless Wells Fargo's argument that LJM's evidentiary proffer is inadmissible parol evidence. (See Pl. Reply at 21.)

accurate to characterize to LJM's risk treatment as SPAN only." (Docket entry no. 256-7, at 2; see also docket entry nos. 256-6 at 2; Kaufman Dep. at 112; 56.1 St. ¶¶ 24-25; 56.1 Counterst. ¶¶ 98-101.) Ariathurai also testified that he "was not sure" "whether IML [wa]s a risk limit that the FCM—that Wells Fargo imposed." (Ariathurai Dep. at 163-64; see also id. at 97-98 ("[W]e weren't aware of the limit [IML] . . . it was some separate internal limit that they had not communicated with us, so I wasn't aware of it and I wasn't really sure where it was coming from.").) Wells Fargo is not entitled to judgment as a matter of law under this theory because there is a genuine dispute as to whether the IMLs that Wells Fargo set functioned as risk limits within the meaning of Section 15, and thus a reasonable juror could concluded that LJM was not in breach of the FCM Agreement.

3. Breach of Section 3(a)(v) Triggered an "Event of Default," Giving Wells Fargo Section 19 Rights

Finally, Wells Fargo contends that it had the right, under Section 19, to demand that LJM sell E-mini futures sales and liquidate, because LJM triggered an event of default by breaching Section 3(a)(v). Under Section 3(a)(v), LJM represented and warranted that it had "the capacity to absorb potential losses related to its trading strategy and the positions held by it." (FCM Agreement Section 3(a)(v); see also id. § 18(f) (providing that an event of default occurs when "any representation or warranty made by Customer [LJM] is not or ceases to be correct or true in any material respect").) Here again, Wells Fargo argues that its Section 19 claim is viable notwithstanding LJM's claim that Wells Fargo breached Section 24.

Putting aside the parties' dispute over whether LJM had a continuing obligation to abide by Section 3(a)(v) as of the morning of February 6, 2018,[11] genuine disputes of material fact exist as to whether LJM had the "capacity to absorb potential losses" as of that morning.[12] Specifically, Wells Fargo raises two arguments regarding LJM's capacity, but neither is sufficient to entitle Wells Fargo to judgment as a matter of law.

First, Wells Fargo contends that LJM was unable to satisfy its margin calls, which totaled nearly $1.5 billion as of the morning of February 6. (56.1 St. ¶ 43.) According to Wells Fargo, LJM itself admitted—by way of a statement LJM made in a related case—that "it became clear that LJM could not satisfy the significant margin call." (56.1 St. ¶ 44 (quoting docket entry no. 245-100 ¶ 98).) LJM, however, proffers sufficient evidence to create a genuine factual dispute with respect to whether it had capacity to absorb potential losses. For example, Caine testified that, but for Wells Fargo's coercive intervention, LJM could have satisfied the margin calls. (Caine Dep. at 161; Caine Decl. ¶¶ 45-47.) LJM also proffers a contemporaneous report that McBride made to the board of one of LJM's funds where "[s]he indicated that LJM did not

---

11 LJM contends that the representation of Section 3(a)(v) was effective only at the time of the agreement and at the time the "Customer submits the transaction for clearing," citing Section 3(a)—which provides that "Customer [LJM] represents and warrants as of the date hereof . . . and Customer shall be deemed to have repeated each representation, warranty and agreement at the time of entering into each transaction and at the time Customer submits the transaction for clearing." According to LJM, Wells Fargo breached Section 24 prior to LJM submitting any transaction for clearing. (Def. Mem. at 47.) In opposition, Wells Fargo points to Section 18(f), which provides that LJM has defaulted where "any representation or warranty made by Customer is not or ceases to be correct or true in any material respect." (FCM Agreement § 18(f) (emphasis added by Plaintiff).) According to Wells Fargo, LJM defaulted because the representation of Section 3(a)(v) "cease[d] to be correct." (Pl. Reply at 22.)

12 The Court uses the morning of February 6, 2018, as the relevant time frame because that is when Wells Fargo allegedly directed LJM to sell E-mini futures and liquidate its account.

believe the LJM Fund would need to be closed that day, that the net margin call would not be greater than the Fund's net assets and that there would be cash remaining to meet any redemption request." (Docket entry no. 245-65, at 5.)[13] On the prior day, February 5, LJM also wired $360 million to Wells Fargo to satisfy margin requirements for LJM Preservation and Growth Fund, another LJM fund that is not party to this action. (56.1 Counterst. ¶¶ 111-13.) Finally, LJM contends that Wells Fargo's margin requirements were inaccurately calculated because they failed to account for certain risk-reducing trades that LJM had made the previous day, February 5. (56.1 Counterst. ¶¶ 107-110.) Because LJM, the nonmoving party, has come forward with admissible evidence sufficient to raise a genuine issue of fact for trial, summary judgment on these grounds must be denied. See Celotex, 477 U.S. at 322-23.

Second, Wells Fargo argues that LJM's funds were "insolvent," as evidenced by the fact that several funds, including Defendant LJM Investment Fund, had a negative "net liquidation value" ("NLV"). (Pl. Mem. 25, 45; 56.1 St. ¶¶ 45-46.) Yet Wells Fargo provides no explanation of—or basis for how it calculated—NLV and fails to explain how a negative NLV equates to a lack of "capacity to absorb potential losses" under Section 3(a)(v) of the FCM Agreement. Even if a negative NLV were a breach of Section 3(a)(v), the record shows that NLV was actually positive for several of LJM's Counterclaimant funds during the relevant period. (See, e.g., docket entry no. 245-48 at 2 (showing that LJM Master Trading Fund had an

---

13 The margin calls were made on the morning of February 6, and—under Section 10 of the FCM Agreement—were not due until close of the business on February 6. (See FCM Agreement § 10 (providing that "all deposits or delivery of Margin by Customer to WFS shall be made by the Transfer Deadline" and defining "Transfer Deadline" to mean "with respect to any demand for Margin made on or before 12:00 noon EST on a business day, by the close of that business day").)

NLV of 4.5).) Because this argument is insufficiently supported on the current record, summary judgment is not appropriate. See Golden Pac. Bancorp, 375 F.3d at 200.

B. LJM's Counterclaim

Wells Fargo also moves for summary judgment on LJM's counterclaim that Wells Fargo breached Section 24 of the FCM Agreement.[14] LJM claims that it had the right under Section 24 to "close out open positions . . . promptly,"[15] which Wells Fargo breached when it commandeered LJM's trading accounts and demanded immediate E-mini futures sales and liquidation. (FCM Agreement § 24 ("In the event of a notice terminating this Agreement, Customer [LJM] shall either close out open positions in the Account or arrange for such open positions to be transferred to another FCM promptly.").) While this Court has not yet—and need not for purposes of this motion practice— determined what minimum amount of time

14 LJM no longer advances—and waives—any claim that Wells Fargo breached LJM's right to "arrange for such open positions to be transferred to another FCM promptly." (FCM Agreement § 24); see Palmieri v. Lynch, 392 F.3d 73, 87 (2d Cir. 2004) ("[The plaintiff] failed to . . . raise this argument in his opposition to summary judgment. Thus, this argument has been waived."). Nor could LJM survive summary judgment on this claim because the undisputed factual record shows that LJM never considered transferring its accounts. (Ariathurai Dep. 220-21 (testifying that no one "discuss[ed] the possibility of moving the Wells Fargo account to a different FCM" "on the morning of the 6th," but if the idea had been raised, "I would have dismissed it out of hand. Like I literally would have dismissed it out of hand"); docket entry no. 245-65 (minutes for February 6, 2018, 12:30 PM board meeting for one of LJM's funds stating that "Ms. McBride indicated that at the time there was no immediate alternative to Wells Fargo as an available FCM that LJM could engage to trade on the Fund's behalf").)

15 Earlier in this litigation, LJM moved to amend its answer to add its Section 24 counterclaim; Wells Fargo opposed the motion, arguing futility. In rejecting those futility arguments and allowing the amendment, the Court held that "LJM has plausibly pled that WFS's demand that LJM immediately liquidate its open positions on the morning of February 6 breached Section 24 of the Agreement." Wells Fargo Sec., LLC v. LJM Inv. Fund, L.P., No. 18 CV 2020-LTS-SLC, 2021 WL 1198931, at *6 (S.D.N.Y. Mar. 30, 2021).

"promptly" requires, this Court previously rejected Well Fargo's argument that "promptly" means "immediately." Wells Fargo Sec., LLC v. LJM Inv. Fund, L.P., No. 18 CV 2020-LTS-SLC, 2021 WL 1198931, at *5-6 (S.D.N.Y. Mar. 30, 2021). Now, at this summary judgment stage, LJM has proffered sufficient evidence to sustain its allegations of breach. As detailed at length above, genuine disputes of material fact remain as to whether Wells Fargo demanded immediate, not prompt, E-mini futures sales and liquidation, and whether LJM willingly agreed to those measures or had an alternative trading plan in response to Volmageddon and would not have otherwise sold E-mini futures. Supra pp. 6-9 (discussing the dispute over the robustness of LJM's risk management in high volatility events); supra pp. 9-12 (discussing the dispute over the impact of Volmageddon on LJM's portfolio and whether LJM had a trading strategy in response to Volmageddon); supra pp. 12-16 (discussing the dispute over whether Wells Fargo directed LJM to immediately sell E-mini futures and liquidate). There is also a dispute as to whether there was, indeed, a contract to breach or whether Wells Fargo terminated the FCM Agreement under Section 24 as Wells Fargo purported to rescind that termination about eight hours after it sent termination notices on the morning of February 6, 2018. (See supra pp. 13, 16.)

Wells Fargo's other arguments (Pl. Reply at 6-11) are unavailing as they do not address the core of LJM's counterclaim, which is that Wells Fargo "demand[ed] that LJM immediately liquidate its open positions on the morning of February 6 [in] breach[ of] Section 24 of the Agreement" and, by doing so, thwarted LJM's contractual right to manage its reaction to Volmageddon. Wells Fargo Sec., LLC v. LJM Inv. Fund, L.P., No. 18 CV 2020-LTS-SLC, 2021 WL 1198931, at *6 (S.D.N.Y. Mar. 30, 2021). For example, Wells Fargo discusses at length the doctrine of duress, but that doctrine has no application here because LJM brings a breach of contract claim, not a claim for duress. (See Pl. Reply at 10-11; Pl. Mem. at 46-52; Defs. Mem. at

45-56 ("To be clear, LJM's claim is based upon WFS' clear breach and repudiation of its obligations under § 24 of the FCM Agreement.").) Because the plain language of Section 24 provides LJM the right to "close out open positions . . . promptly," not immediately, and LJM has proffered sufficient evidence that Wells Fargo violated that right by demanding an immediate sale of E-mini futures and liquidation, Wells Fargo's motion for summary judgment as to this counterclaim is denied.

## III. Conclusion

For the reasons explained above, Plaintiff Wells Fargo's motion for summary judgment as to Count One and Counterclaim One is denied. Docket Entry No. 242 is resolved.

Defendants LJM Investment Fund's and LJM Partners' letter motion for spoliation sanctions is denied in its entirety because Defendants have identified no conduct rising to the level of willfulness or prejudice that would warrant the extreme sanction of default, nor an appropriate basis for adverse inferences given the factual and temporal context of the application.[16] Docket Entry No. 282 is resolved.

---

16 In Defendants' motion for sanctions (docket entry no. 282; see also docket entry no. 283), Defendants ask "for sanctions for spoliation of evidence under Federal Rule of Civil Procedure 37(e)(1) & (2) arising from the intentional failure of [Plaintiff] WFS to preserve and produce thousands of text messages and voicemail messages reflected in Call Detail Records subpoenaed from AT&T exchanged by key WFS personnel during the critical period in February 2018 . . . ." (Docket entry no. 282, at 1.) Specifically, Defendants ask for either a default judgment in their favor on their counterclaim or an adverse inference and the denial of Plaintiff's motion for summary judgment. (Id. at 1-2.) As to the first request, Defendants have not met their burden of showing that default judgment is appropriate. See Chan v. Triple 8 Palace, Inc., No. 03-CV-6048-GEL-JCF, 2005 WL 1925579, at *9 (S.D.N.Y. Aug. 11, 2005) (describing default judgment as a "draconian remedy" that "should be imposed only in extreme circumstances" (citation omitted)). Nor, given the parties' respective contentions regarding the type of material requested and the timing and specificity of requests, is the Court persuaded that any

The stay ordered in Docket Entry No. 270 is vacated. The Final Pretrial Conference is hereby rescheduled for **February 19, 2027 at 11:00 AM**. (See docket entry no. 286.) The parties must confer and make their submissions in advance of that date in accordance with the Pre-trial Scheduling Order. (Docket entry no. 225.) The parties are also directed to meet and confer and request a conference with Magistrate Judge Cave to discuss settlement and any outstanding pretrial issues. If the parties are unable to reach a settlement, the parties shall file a status report by **January 8, 2027**, that includes their estimate of the amount of time required for trial.

SO ORDERED.

Dated: New York, New York
September 15, 2026

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge

---

sanction is appropriate. In any event, as explained above, Wells Fargo is not entitled to summary judgment on this record. The sanctions motion is, accordingly, denied.